**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ X

In re:                                                    :       Chapter 11
                                                          :       Case No. 08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS INC., *et al.,*                   :
                                                          :
                            Debtors.                      :

------------------------------------------------------------------------ X

LEHMAN BROTHERS HOLDINGS INC., LEHMAN          :
BROTHERS SPECIAL FINANCING INC., LEHMAN        :
BROTHERS COMMODITY SERVICES INC., LEHMAN       :
BROTHERS COMMERCIAL CORP., and                 :
OFFICIAL COMMITTEE OF UNSECURED                :
CREDITORS OF LEHMAN BROTHERS HOLDINGS          :
INC.,                                          :
                    Plaintiffs and Proposed    :
                    Plaintiff Intervenor,      :
                                               :
                 -against-                     :
                                               :       Adversary Proceeding
                                               :
JPMORGAN CHASE BANK, N.A., J.P. MORGAN         :       No.: 12-01874 (JMP)
MARKETS LIMITED (F/K/A BEAR STEARNS            :
INTERNATIONAL LIMITED), J.P. MORGAN            :
SECURITIES LTD., J. P. MORGAN VENTURES         :
ENERGY CORPORATION, JP MORGAN CHASE AND        :
CO., JPMORGAN BANK DUBLIN (F/K/A BEAR          :
STEARNS BANK PLC), BEAR STEARNS CREDIT         :
PRODUCTS INC. and BEAR STEARNS FOREX INC.,     :
                                               :
                                               :
                            Defendants.        :

------------------------------------------------------------------------ X

## FIRST AMENDED COMPLAINT AND OBJECTION TO CLAIM NOS. 66451, 66453, 66454, 66455, 66462, 66470, 66472, 66473, 66474, AND 66476

## [REDACTED PER STIPULATION]

Plaintiffs Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Commodity Services Inc. ("LBCS"), Lehman Brothers Commercial Corporation ("LBCC" and collectively with LBSF and LBCS, the "Lehman Subsidiaries"), and Lehman Brothers Holdings Inc. ("LBHI," and together with the Lehman Subsidiaries, "Lehman") as debtors and debtors in possession, and the Official Committee of Unsecured Creditors (the "Committee"), by their undersigned attorneys, allege the following against defendants JPMorgan Chase Bank, N.A. ("JPMCB"), J.P. Morgan Markets Limited (f/k/a Bear Stearns International Limited) ("JPMM"), J.P. Morgan Securities Ltd. ("JPMSL"), J. P. Morgan Ventures Energy Corporation ("JPMVEC"), JPMorgan Chase & Co. ("JPMC & Co."), J.P. Morgan Bank Dublin (f/k/a Bear Stearns Bank Plc) ("JPMBD"), Bear Stearns Forex Inc. ("BSFX"), and Bear Stearns Credit Products Inc. ("BSCP" and collectively with JPMCB, JPMM, JPMSL, JPMVEC, JPMC & Co., JPMBD, BSFX and BSCP, "JPMorgan"):

## PRELIMINARY STATEMENT

1.      JPMorgan artificially inflated the value of its claims arising under derivatives agreements with the Lehman Subsidiaries by more than $2.3 billion. It did so by systematically charging for phantom losses it did not suffer, failing to offset counterbalancing positions, opportunistically selecting highly favorable valuation dates and times, and valuing trades inconsistently to its own advantage. All the while, its eyes were trained on an $8.6 billion slush fund of excess cash collateral that it extracted from Lehman the week prior to bankruptcy, which it planned to use to ensure a 100 percent recovery of its contrived claims. Contrary to JPMorgan's fictitious claims of $2.235 billion, JPMorgan's derivatives claims should actually total only $250 million. In addition, JPMorgan owes Lehman more than $339 million as the result of the termination of certain of the parties' derivatives agreements. The resolution of this

matter is of great importance to the estate and its creditors, as JPMorgan's reportedly secured claims remain the largest disputed claims of their kind in this chapter 11 case.

2. By using its leverage as Lehman's primary clearing bank, JPMorgan forced Lehman to turn over $8.6 billion, including its last $5 billion of cash on the final day before it filed for bankruptcy, not for any legitimate exposure, but rather to profiteer from Lehman's demise. For example, it used over $700 million of that cash to make third party investors in its asset management funds whole on any Lehman-related losses. Only after Lehman fully briefed its objection to this insupportable claim did JPMorgan return 98% of this cash in a settlement. As reflected in another claim objection filed with this Court, JPMorgan also opportunistically profited by hundreds of millions of dollars by inflating its claims through self-dealing and other commercially unreasonable practices in connection with the liquidation of the LBI portfolio it held as security for its clearance claims. Again, JPMorgan paid itself 100 cents on the dollar for these inflated claims out of the slush fund it siphoned from Lehman, while virtually all other creditors would recover cents on the dollar. JPMorgan's pattern of fabricating losses as cover for its profiteering scheme is nowhere better exemplified than in JPMorgan's derivatives claims.

3. The derivatives claims submitted by JPMorgan were built on nonexistent losses and defy commercial reality. According to JPMorgan's own calculations, the net value of the derivatives positions was $998 million in favor of the Lehman Subsidiaries at the end of the day on September 12, 2008. In accordance with their standard collateral arrangements, as of September 12, 2008, on a net basis JPMorgan had posted $990 million of collateral to the Lehman Subsidiaries to secure the Lehman Subsidiaries' large in-the-money position under the parties' derivatives agreements. This in-the-money position for Lehman of $998 million had

grown to that level over the last several months prior to LBHI's filing due mainly to one market development. In their portfolio of credit default swaps ("CDS") with JPMorgan, the Lehman Subsidiaries were net purchasers of credit protection. This net position created value for the Lehman Subsidiaries as increasing market concerns about credit defaults led to higher credit spreads (higher prices to purchase credit protection). This development increased the value of the existing credit protection that had been purchased by the Lehman Subsidiaries.

4.      The actual change in market value of the derivatives portfolio from September 12, 2008 to September 15, 2008, based on independently available market data, was approximately $110 million in favor of the Lehman Subsidiaries. That $110 million swing in value takes into account the substantial movements that occurred in the market on the day of LBHI's chapter 11 filing. This large swing in favor of the Lehman Subsidiaries on September 15 can be explained by the fact that on that day credit spreads widened due to concerns with the increased risk of credit defaults in the aftermath of LBHI's bankruptcy filing. As a result, the derivatives portfolio was worth more than $1.1 billion to Lehman as of the date of termination.

5.      After reducing this $1.1 billion position in Lehman's favor by the approximately $1 billion in collateral that had been posted by JPMorgan to collateralize Lehman's pre-bankruptcy in-the-money position, JPMorgan in fact owes Lehman more than $339 million as a result of the termination of the swap agreements and has claims of $250 million. Yet, JPMorgan submitted a net claim for more than $2.2 billion (as demonstrated in paragraph 218 on page 89 below). Those claims are premised on a $2.3 billion market movement on September 15 in its favor. There is no basis in economic reality for inflating the claims to this stratospheric level.

6.      JPMorgan's proofs of claim would have the Court believe that the value of their derivatives positions somehow swung *more than $2.3 billion in JPMorgan's favor* when LBHI filed its chapter 11 petition on Monday, September 15, 2008, from $998 million in favor of the Lehman Subsidiaries to a net value of $1.323 billion in favor of JPMorgan.  However, JPMorgan's own internal calculations from September 15 valued the portfolio at more than $926 million in favor of the Lehman Subsidiaries, a difference of more than $2.2 billion from the valuations implied by its claims.  There is no plausible justification for JPMorgan submitting a claim in this bankruptcy that exceeded its own internal valuations by more than $2.2 billion.

7.      A simple graph comparing JPMorgan's internal mark-to-market valuations of the derivatives portfolio on September 12 and September 15 with the valuation used to calculate its claims starkly illustrates how JPMorgan's dramatically inflated claims bore no relation to the true market value of its positions:



As JPMorgan's own calculations show, the alleged $2.3 billion swing in the value of the derivatives portfolio reflected in JPMorgan's claims is not remotely attributable to any actual

shift in the market value of these positions. Instead, it was entirely the product of JPMorgan's intentional manipulation of the close-out process, in order to take advantage of (and retroactively justify) the billions of dollars of cash it had extracted from LBHI the previous week. Far from taking any actual loss, JPMorgan sought to profit on Lehman's demise through an outrageous overstatement of its claims that it hopes will help justify its keeping $8.6 billion of Lehman's cash collateral.

8. As explained in the First Amended Complaint brought by LBHI and the Committee against JPMCB [Adv. Pro. No. 10-03266], JPMCB was the primary agent for clearing and settling trades for LBHI and its subsidiaries. In the week prior to LBHI's bankruptcy, JPMCB improperly used this leverage to extract $8.6 billion in cash and money market funds from LBHI under the cover of a guaranty and security agreement executed as of September 9, 2008 (the "September Guaranty" and "September Security Agreement"). With an $8.6 billion cushion of cash and cash equivalents in-hand – which would have to be returned unless JPMorgan could manufacture a basis for withholding it – JPMorgan had every incentive to disregard the mandates of good faith and commercial reasonableness and to inflate its derivatives claims. JPMorgan was not only motivated to inflate its claims because it would be paid 100 cents on the dollar by virtue of its eleventh hour parent-level guaranty agreements and collateral transfers from LBHI (as opposed to other derivatives counterparties to the Lehman Subsidiaries that would receive unsecured distributions), but JPMCB also needed an after-the-fact justification for its $8.6 billion collateral grab. Indeed, JPMorgan was uniquely motivated to claim a $2.3 billion swing in its favor, instead of submitting properly calculated termination amounts that would show the Lehman Subsidiaries were in-the-money on a net basis under these contracts at all times and there was no relationship between the $8.6 billion demand and the

parties' derivatives transactions. To achieve this outrageous overstatement of its claims, JPMorgan violated, in several specific respects, the governing contracts, New York law, and U.S. bankruptcy law.

9. ***First***, JPMorgan has deliberately obfuscated its claims by, among other things, embedding hidden add-ons in the erroneous and inflated prices it assigned to the positions. Without complete information about JPMorgan's close-out process, Lehman cannot fully evaluate JPMorgan's claims on a trade-by-trade basis. For example, it is impossible for Lehman to determine the exact amount of the add-ons embedded in JPMorgan's claims because JPMorgan has refused to provide its mid-market values for each position. Unable or unwilling to substantiate its greatly inflated claims, JPMorgan has failed to provide this information despite repeated requests to do so. Accordingly, its claims should be disallowed on this basis alone under the Court's Bar Date Order and the parties' stipulation.

10. ***Second***, both the contracts and bankruptcy law mandated that JPMorgan calculate its claims by valuing the terminated trades as of the date of termination selected by JPMorgan – September 15, 2008 under almost all agreements – so long as values could be determined as of that date. Commercially reasonable determinants of value clearly existed for all of JPMorgan's derivatives positions on September 15, as evidenced by the ability of other Lehman counterparties to value hundreds of thousands of similar trades as of that date. Unfazed by the clear requirement of the contracts and bankruptcy law, JPMorgan instead valued a majority of its trades as of later dates when it would be profitable to do so.

11. In fact, JPMorgan was so eager to profit from Lehman's demise that, for at least one portfolio of trades, it discarded close-out values obtained on September 15 and re-marked the same trades as of September 16 and again as of September 17 to inflate its claims

when it became apparent that the market was moving in its favor with respect to these trades.  A JPMorgan executive explained he was re-marking this portfolio as of September 17 specifically to capture increased profit for JPMorgan, writing, "Pnl with lehman trades would be up 50 instead of down 50.  As a result I am going to change the claim to tonight's levels."[1]  By manipulating close-out dates in this manner, JPMorgan inflated its claims by hundreds of millions of dollars in blatant disregard of the parties' contracts and the law.

12.     *Third*, JPMorgan appears to have inflated its claims by hundreds of millions of dollars through the addition of phantom charges for self-described "losses" that JPMorgan never incurred or would have incurred.  Other than in a few, rare instances, JPMorgan's claims for losses are not based on actual replacement trades, but rather on hypothetical replacement trades yielding hypothetical losses that would never have been incurred.  Instead of hypothetically closing out trades at their actual mid-market value – the price at which the potential for loss is offset by the potential for gain – JPMorgan charged a higher price, presumably by tacking on "add-on" costs that it never incurred.  As a market-maker with access to the inter-dealer market, JPMorgan was not exposed to these costs.  JPMorgan was, and is, a market-maker with a very large customer base and access to the inter-dealer markets.  Thus, JPMorgan was generally able to transact in connection with its Lehman exposure at or near mid-market values.  Indeed, because of JPMorgan's large customer base, JPMorgan would have been able to profit from bid/offer spreads, not be punished by them.

13.     Therefore, instead of costs, the add-ons were actually built-in profits that JPMorgan took for itself.  In reality, many of the "add-ons" claimed by JPMorgan do not reflect actual friction costs, but rather are attempts by JPMorgan to collect profits.  JPMorgan cannot

---

[1]   Email from Jeremy Barnum (JPMCB) to Daniel Pinto (JPMCB), Sept. 17, 2008 [JPM-LBHI00619389] (attached hereto as Exhibit A).

justify taking add-ons today based on hypothetical losses that may or may not occur in the future, when they are holding positions that have an equal chance of increasing or decreasing in value in the future.

14. Moreover, even if JPMorgan had replaced the trades and actually incurred these types of charges, which it did not, JPMorgan would have paid at most a tiny percentage of the hypothetical charges it now appears to claim. JPMorgan artificially ballooned these hypothetical charges by, for example, using spreads that are typically charged by market-makers to end users with limited market access, ignoring that as a market-maker with a large customer base and access to the inter-dealer market where trades are generally done at or near mid-market, JPMorgan typically traded with little or no spreads and in certain cases would have been able to profit from bid/offer spreads. These inflated, phantom losses produced a windfall for JPMorgan that is barred by the derivatives agreements and governing law, which only permit the non-defaulting party to receive the economic equivalent of the terminated trades.

15. **Fourth**, JPMorgan disregarded its own internal risk management practice of managing its derivatives book on a portfolio basis. Instead of applying portfolio aggregation to determine the economic equivalent of the material terms of the transactions as a group – as any reasonable trader or risk manager would do, as JPMorgan customarily did, and as commercial reasonableness requires – JPMorgan closed out the vast majority of the trades in isolation so it could maximize the number of charges for hypothetical losses included in its claims. Even where there were perfectly identical offsetting trades, JPMorgan in many instances added hypothetical add-on charges to both sides of the trades. This procedure was not commercially reasonable, and it greatly inflated the amount of hypothetical losses claimed by JPMorgan.

16.     ***Fifth***, to further inflate its claims, JPMorgan assigned enormously inconsistent prices to identical or substantially similar positions, in a manner that contradicted market practice and defied logic.  For example, LBSF and JPMCB had a large book of single name CDS, which consisted of a net purchase of credit protection by LBSF.  LBSF and JPMCB also had a large book of index CDS going in the opposite direction, with JPMCB as a net purchaser of credit protection.  There was substantial overlap, with the index CDS positions holding many of the same names that existed in the single name CDS portfolio.  For single name CDS where LBSF was a net buyer of protection, JPMCB marked prices *down 25%*, or $483 million, from September 12 to 17.  Yet, paradoxically, for index CDS where LBSF was a net seller of protection, JPMCB marked prices *up 120%*, or $490 million, during the exact same period.   It defies logic for JPMorgan to profit on both long and short positions on the same risk at the same time.  In effect, JPMorgan's close-out methodology was:  "heads, JPMorgan wins" and "tails, Lehman loses."

17.     As explained in detail below, JPMCB turned this valuable LBSF CDS position into a claim against LBSF in substantial part through a pattern of placing different values on identical or substantially equivalent CDS transactions depending on which side of the trade JPMCB was on.  Frequently, on a pair of trades that were identical except for whether JPMCB or LBSF was the buyer of credit protection, JPMCB calculated a higher value where JPMCB was the buyer of protection and a lower value where LBSF was the buyer for the sole purpose of manufacturing higher claims.  There was no financial or market justification for this differential treatment.  When closing out two economically identical and offsetting CDS transactions and taking into account the loss mitigation inherent in the two positions, the net amount owed by the parties to one another should have been zero.

18.     JPMorgan inflated its claims with similar inexplicable pricing anomalies in interest rate trading.  As explained in detail below, JPMorgan did not price its plain vanilla interest rate swap transactions according to any type of industry standard curve, and instead employed arbitrary and inconsistent procedures pursuant to which identical or very similar plain vanilla transactions were valued dozens or even hundreds of basis points apart.  This haphazard and even irrational approach resulted in an aggregate claim inflation of more than $756 million by JPMorgan across its entire interest rate portfolio with LBSF.  These and other similarly inconsistent calculations described below had no basis in reality and significantly increased JPMorgan's claims.

19.     ***Finally***, even under its own improper methods for calculating termination payments, JPMorgan has acknowledged payables due to the Lehman Subsidiaries under a number of the parties' agreements.  Yet JPMorgan has never paid the Lehman Subsidiaries a single dollar.  Instead, JPMorgan engaged in a series of triangular setoffs, even though it is clear that such triangular setoffs constitute violations of U.S. bankruptcy law.

20.     Through the use of these and other grossly unreasonable procedures, JPMorgan fabricated losses to create vastly inflated derivatives claims, in order to keep the billions of dollars of cash it had extracted from LBHI.  JPMorgan's net derivatives claim should be reduced or disallowed by over $2 billion as detailed below.

## **BACKGROUND**

(a)     *The Course of Dealing between JPMorgan and Lehman*

21.     Prior to LBHI's bankruptcy filing on September 15, 2008, JPMorgan was among the Lehman Subsidiaries' largest global counterparties in derivatives transactions, in terms of both number of trades and aggregate notional amounts.  JPMorgan and Lehman were

two of only a relatively small number of major global dealers in derivatives transactions.  Both firms were sophisticated in that regard, and had in place massive infrastructures for executing transactions, marking trades to market, valuing their respective positions, and exchanging collateral to reflect those positions.

22.     Derivatives trading between the firms was governed by a number of "master agreements," each between a JPMorgan entity and a Lehman Subsidiary.  Plaintiffs object to JPMorgan's claims under the following ten master agreements (with their related schedules, confirmations and credit support annexes, the "Master Agreements"):

|     | **Date** | **Lehman Subsidiary** | **JPMorgan Entity** | **Type** | **Agreement** |
| --- | --- | --- | --- | --- | --- |
| 1. | December 20, 1995 | LBSF | Morgan Guaranty Trust Co. of NY/JPMCB | ISDA | "LBSF-JPMCB Agreement" |
| 2. | February 14, 2003 | LBSF | JPMC & Co. | ISDA | "LBSF-JPMC & Co. Agreement" |
| 3. | January 6, 1993 | LBSF | Bear Stearns Bank Dublin/JPMBD | ISDA | "LBSF-JPMBD Agreement" |
| 4. | July 1, 2003 | LBSF | BSCP | ISDA | "LBSF-BSCP Agreement" |
| 5. | July 11, 2001 | LBSF | Bear Stearns International Limited/JPMM | ISDA | "LBSF-JPMM Agreement" |
| 6. | February 2, 2006 | LBCS | JPMCB | ISDA | "LBCS-JPMCB Agreement" |
| 7. | October 1, 2007 | LBCS | JPMSL | ISDA | "LBCS-JPMSL Agreement" |
| 8. | August 8, 2006 | LBCS | JPMVEC | ISDA | "LBCS-JPMVEC Agreement" |
| 9. | November 15, 1993 | LBCC | Morgan Guaranty Trust Co. of NY/JPMCB | ISDA | "LBCC-JPMCB Agreement" |
| 10. | March 9, 1995 | LBCC | BSFX | FEOMA | "LBCC-BSFX Agreement" |

LBHI is a guarantor of the Lehman Subsidiaries' obligations under the Master Agreements and, therefore, is a "Credit Support Provider" under the Master Agreements.

23.     In the normal course of business prior to the LBHI bankruptcy filing, on each trading day, JPMorgan and Lehman marked to market the value of their derivatives portfolios under each ISDA Master Agreement, agreed on those values, and exchanged cash collateral to secure whichever party was "in-the-money" on a net basis under each ISDA Master Agreement.

(b)     *The Chapter 11 Case and Claims Procedures*

24.      Beginning on September 15, 2008 (the "Commencement Date") and periodically thereafter, Lehman filed with this Court voluntary cases under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"). Lehman's confirmed chapter 11 plans went effective in March 2012.

25.     JPMorgan submitted calculation statements, dated October 17, 2008, as its basis for the calculation of its derivatives claims.

26.     On July 2, 2009, this Court entered an order setting forth the procedures and deadlines for filing proofs of claim in these chapter 11 cases (the "Bar Date Order") [Docket No. 4271]. A copy of the Bar Date Order was made publicly available at http://www.lehman-docket.com.

27.     All claimants received notice of the Bar Date Order by mail. *See* Notice of Deadlines for Filing Proofs of Claim (the "Bar Date Notice"). The Bar Date Notice also was posted on the docket, and the Bar Date Order was published in The New York Times (International Edition), The Wall Street Journal (International Edition), and The Financial Times. A list of the debtors in these chapter 11 cases and their respective case numbers was included as part of the Bar Date Notice as well as on the instructions to the proof of claim form. Bar Date Notice at Schedule A. In accordance with the Bar Date Order's requirement that claims be filed

against the proper debtor, the Bar Date notice stated, in bold-face type and in capital letters, that "YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU DO NOT HAVE A CLAIM AGAINST THE DEBTORS." *Id.* at 3.

28.     On July 2, 2009, this Court entered the Stipulation, Agreement and Order Exempting JPMorgan From the Obligation to Comply with Certain Requirements of the Bar Date Order Related to Derivative Contracts [Docket No. 4272] (the "Stipulation").  Among other things, the Stipulation required JPMorgan to supply Lehman with documentation that would substantiate and explain its claims asserted under the Master Agreements.  Despite numerous requests from Lehman, JPMorgan has failed to offer any cogent explanation, rationale or support to allow Lehman to understand how JPMorgan managed to calculate more than $2.2 billion in claims, when the Lehman Subsidiaries were in-the-money by approximately $1 billion only one trading day before.  And this seismic shift in value away from Lehman occurred during the period of a few days starting on September 15, 2008 when the markets generally were moving in favor of the Lehman Subsidiaries' positions vis-à-vis JPMorgan .  Nonetheless, based on the information to which Plaintiffs do have access, it is apparent that JPMorgan manipulated its calculations in a number of fundamentally improper ways.

(c)     *JPMorgan Terminates the Master Agreements*

29.      In the week prior to September 15, 2008, the parties recognized and agreed that, on an aggregate net basis under the ten Master Agreements, the Lehman Subsidiaries were substantially "in-the-money."  As a result, as of the close of business on Friday September 12, 2008, to cover the Lehman Subsidiaries' exposure, JPMorgan had posted $990,105,920 in net cash collateral to the Lehman Subsidiaries.

30.     On the very next trading day, September 15, 2008, LBHI filed for bankruptcy.  Under the terms of the Master Agreements, the commencement of LBHI's chapter 11 case constituted an "Event of Default" by the Lehman Subsidiaries and gave JPMorgan the right to terminate the transactions under the Master Agreements.  Later that same day, JPMorgan notified the Lehman Subsidiaries that it was terminating the derivatives transactions under nine of the Master Agreements and designating September 15, 2008 as the "Early Termination Date."[2]

31.     Under the Master Agreements, the terminating party had been designated as the party entitled to calculate the amount that was due upon early termination.  The procedure for calculating that amount depended on the method the parties had selected.  Each calculation method is intended to value the parties' positions on all outstanding transactions as of the Early Termination Date, and to determine the overall net amount owed (in either direction) on those transactions.  The Master Agreements expressly require the terminating party to calculate each overall net amount in good faith and through the use of commercially reasonable procedures.

*(i)     The COA Master Agreements*

32.     All nine ISDA Master Agreements between the Lehman Subsidiaries and JPMorgan were entered into using the 1992 form of the ISDA Master Agreement.  Under that form the parties have the choice of either Market Quotation or Loss as the measure of the settlement amount upon early termination.  However, in August 2008 LBSF, LBCS, LBCC and certain JPMorgan entities adopted certain provisions related to close-out calculations from the 2002 ISDA Master Agreement by executing the Close-out Amount Multilateral Agreement (the "Close-out Amount Agreement").  The following three Master Agreements were amended by the

---

[2]   BSFX notified LBSF on September 16, 2008 that it was terminating the transactions under the LBSF-BSFX Agreement and designating September 16, 2008 as the "Early Termination Date."

Close-out Amount Agreement:

1. the LBSF-JPMCB Agreement;
2. the LBCS-JPMCB Agreement; and
3. the LBCC-JPMCB Agreement.

This group of Master Agreements is referred to herein as the "COA Master Agreements."

      33.     Under the COA Master Agreements, the parties agreed to use the Close-out Amount method to measure the settlement amount upon early termination. Close-out Amount is defined as:

> *[T]he amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances* (expressed as a positive number) *or gains of the Determining Party that are or would be realized under then prevailing circumstances* (expressed as a negative number) *in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of the Terminated Transaction or group of Terminated Transactions*, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in Section 2(a)(iii) and (b) the options rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.
>
> Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result.

2002 ISDA Master Agreement § 14 (emphasis added).

      34.     In other words, each Close-out Amount should have been determined by JPMorgan on the basis of its commercially reasonable, good faith determination of its total losses and costs (or gains) that are or would be incurred (or realized) under then prevailing circumstances in connection with Terminated Transaction(s) as of the Early Termination Date (or as soon thereafter as was commercially reasonable). *See* 2002 ISDA User's Guide at 24-25.

-16-

35.     The definition of "Close-out Amount" includes four specific requirements that JPMorgan was mandated to comply with in its calculations of the amounts due upon termination of the COA Master Agreements.

- ***First***, the definition of Close-out Amount required that "each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable."  2002 ISDA Master Agreement § 14 ("Close-out Amount" definition).

- ***Second***, the calculation of Close-out Amount must be made using "commercially reasonable procedures."  *Id.*

- ***Third***, those close-out procedures must produce a "commercially reasonable result."  *Id.*

- ***Fourth***, the Close-out Amount only entitles the non-defaulting party to the "economic equivalent" of the terminated transactions, not a windfall profit.  *Id.*

JPMorgan violated each of these four requirements in its calculations of the Close-out Amounts upon termination of the COA Master Agreements.

(ii)     *The Loss Master Agreements*

36.     Under the 1992 form of the ISDA Master Agreement, in order to determine the settlement amount upon early termination, the Non-defaulting Party must determine the present value of the future cash flows of all transactions using either the Market Quotation or the Loss method.  The parties elected to use the Loss method in the Schedules to the following six Master Agreements:

1. the LBSF-JPMC & Co. Agreement;
2. the LBSF-BSCP Agreement;

    3.  the LBSF-JPMBD Agreement;
    4.  the LBSF-JPMM Agreement;
    5.  the LBCS-JPMSL Agreement; and
    6.  the LBCS-JPMVEC Agreement.

This group of Master Agreements is referred to as the "Loss Master Agreements."[3]

        37.    Section 14 of the 1992 ISDA Master Agreement defines "Loss" as

follows:

> ***[A]n amount that [the determining] party reasonably determines
> in good faith to be its total losses and costs (or gain, in which
> case expressed as a negative number)*** . . . including any loss of
> bargain, cost of funding or, at the election of such party but
> without duplication, loss or cost incurred as a result of its
> terminating, liquidating, obtaining or reestablishing any hedge or
> related trading position (or any gain resulting from any of them) . .
> . . A party may (but need not) determine its Loss by reference to
> quotation of relevant rates or prices from one or more leading
> dealers in the relevant markets.

1992 ISDA Master Agreement §14 (emphasis added).

        38.    In other words, under the "Loss" method a Non-defaulting Party is

required to calculate reasonably and in good faith its net losses, costs, and gains incurred as a

result of the early termination of the Terminated Transactions plus Unpaid Amounts. *See* 1992

ISDA User's Guide at 25.

        39.    Similarly, the Foreign Exchange and Options Master Agreement between

LBCC and BSFX requires a non-defaulting party to calculate net gain or loss on early

termination in good faith:

> The Non-defaulting Party shall close out each outstanding
> Currency Obligation (including any Currency Obligation which
> has not been performed and in respect of which the Value Date is
> on or precedes the Close-Out Date) so that each such Currency
> Obligation is canceled and ***the Non-Defaulting Party shall***

---

[3]  These Master Agreements were not amended by the Close-out Amount Agreement to change the Loss
method to the Close-out Amount method because one or both of the parties to the Master Agreement was
not a party to the Close-out Amount Agreement.

> *calculate in good faith with respect to each such canceled*
> *Currency Obligation, the Closing Gain or, as appropriate, the*
> *Closing Loss*.

1995 Foreign Exchange and Options Master Agreement § 8.1 (I)(i).

    (d)    *JPMorgan Inflates its Claims*

40.    On September 22, 2009, JPMorgan filed its original proofs of claim against the Lehman Subsidiaries that arose under the Master Agreements and, with respect to LBHI, in its capacity as Credit Support Provider under the Master Agreements. Subsequently, on April 1, 2010, JPMorgan filed its amended proofs of claim against Lehman (the "JPMorgan Claims").

41.    A proper calculation of the Loss and Close-out Amounts under the Master Agreements as of the close of business on September 15, 2008, using readily available market data and industry standard third-party pricing services, results in a net claim of only $250 million under five of the Master Agreements, while the Lehman Subsidiaries are in fact owed a net amount of $339 million under the parties' other five Master Agreements.

42.    Indeed, JPMorgan's own internal calculations demonstrate that the total net aggregate value of their derivatives transactions with the Lehman Subsidiaries was heavily in the Lehman Subsidiaries' favor after LBHI's bankruptcy. On September 15, 2008, an internal JPMCB report valued the trades under the Master Agreements at more than $926 million in favor of the Lehman Subsidiaries, excluding collateral posted.[4]

43.    Nonetheless, JPMorgan has submitted claims under the Master Agreements of $2,235,664,298 against the Lehman Subsidiaries, and LBHI as guarantor. These claims consist of aggregate net Loss and Close-out Amounts of $1,323,231,570, plus the return

---

[4]  *See* email from Michael S. Atchison (JPMCB) to Henry E. Steuart (JPMCB) & Piers Murray (JPMCB), Sept. 15, 2008 [JPM-LBHI00026781] (attached hereto as Exhibit B).

of the collateral held by the Lehman Subsidiaries (which JPMorgan claims totals $1,003,378,676

after accrued interest, according to JPMorgan's Amended and Restated Annex to Proofs of

Claim)[5], minus net unpaid amounts[6] of $90,945,948 credited to the Lehman Subsidiaries.  This

represents an extraordinary swing of more than $2.3 billion from the position JPMorgan had

acknowledged and agreed to the prior week, and is irreconcilable with JPMorgan's own internal

calculations of the mark-to-market value of the positions on September 15.

44.    The chart below shows the differences among (i) JPMorgan's September

12, 2008 calculation of the net mark-to-market value of the transactions under each Master

Agreement, (ii) JPMorgan's calculation of either the Close-out Amount or the Loss for each

Master Agreement, and (iii) Lehman's market-based calculation of the same at the close of

business on September 15, 2008.

---

[5]   Plaintiffs calculate the net amount of collateral held by the Lehman Subsidiaries as $990,105,920
including interest accrued.

[6]   "Unpaid amounts" are amounts that became payable under a Master Agreement on or prior to the
termination date but remained unpaid.  Under the Master Agreements, certain unpaid amounts are due
from JPMorgan and other unpaid amounts are due from the Lehman Subsidiaries.  According to
JPMorgan's claims, on a net basis $90,945,948 of unpaid amounts are owed by JPMorgan to the Lehman
Subsidiaries.  That net amount is a credit to the Lehman Subsidiaries in the close-out calculations under
the Swap Agreements.  However, Plaintiffs calculate that a net unpaid amount of $1,318,980 should be
credited to JPMorgan.

| Comparison of JPMorgan's Marks on September 12, JPMorgan's Close-out Amount and Loss Calculations, and Leman's Market-Based Calculation of Proper Close-out Amount and Loss Calculations [values in USD to Lehman Subsidiaries][7] | | | |
|---|---|---|---|
| Master Agreement | JPMorgan 9/12 MTM[8] | JPMorgan Close-out Amount/Loss | Lehman Calculation of Close-out Amount/Loss |
| LBSF-JPMCB | 255,152,924 | (1,998,739,323) | 129,338,293 |
| LBSF-JPMC & Co. | (112,552,406) | 0 | 0 |
| LBSF-JPMBD | 965,108,770 | 970,027,203 | 1,098,943,826 |
| LBSF-BSCP | 1,704,707 | 1,525,030 | 1,279,465 |
| LBSF-JPMM | (10,346,911) | (2,130,569) | (1,694,102) |
| LBCS-JPMCB | (64,199,438) | (75,703,989) | (66,021,781) |
| LBCS-JPMSL | (18,737,059) | (23,432,546) | (21,708,305) |
| LBCS-JPMVEC | 44,063,409 | 37,793,377 | 43,965,277 |
| LBCC-JPMCB | (61,548,447) | (220,561,509) | (95,425,122) |
| LBCC-BSFX | N/A[9] | (12,009,244) | (7,461,560) |
| TOTAL | 998,645,549 | (1,323,231,570) | 1,081,215,989 |

To achieve this extraordinary claim inflation of more than $2.3 billion, JPMorgan employed a series of improper and commercially unreasonable procedures.

45.    Through the manipulations described in detail below, JPMorgan deliberately attempted to enrich itself through these Master Agreement claims to the detriment of Lehman and its creditors.  This adversary complaint and claims objection seeks to reduce or disallow the claims filed by JPMorgan under the Master Agreements, and to recover the payments that are due to the Lehman Subsidiaries as a result of the termination of those agreements.

---

[7]  Values are presented from the point of view of the Lehman Subsidiaries.  Thus, negative numbers represent amounts due to JPMorgan.

[8]  JPMorgan's mark-to-market values from the end of the day on September 12 are taken from a contemporaneous report prepared by Michael Atchison of JPMCB.  *See* email from Michael S. Atchison (JPMCB) to Henry E. Steuart (JPMCB) & Piers Murray (JPMCB), Sept. 12, 2008 [JPM-LBHI00009240] (attached hereto as Exhibit C).

[9]  The mark-to-market value for the LBCC-BSFX Agreement was not included in the report prepared by Michael Atchison of JPMCB on September 12.

## THE PARTIES

46.     LBHI is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

47.     LBSF is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

48.     LBCC is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

49.     LBCS is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

50.     The Committee is a statutory committee appointed by the Office of the United States Trustee under section 1102 of the Bankruptcy Code in the above-captioned chapter 11 cases on or about September 16, 2008.

51.     JPMCB is a national banking association chartered under the laws of the United States, with its principal business address at 270 Park Avenue, New York, New York 10017.

52.     JPMM is organized under the laws of England with its principal business address at 125 London Wall, London, EC2Y 5AJ.

53.     JPMSL is organized under the laws of England with its principal business address at 125 London Wall, London, EC2Y 5AJ.

54.     JPMVEC is a Delaware corporation with its principal business address at 270 Park Avenue, New York, New York 10017.

55.     JPMC & Co. is a Delaware corporation with its principal business address at 270 Park Avenue, New York, New York 10017.

56.     JPMBD is organized under the laws of Ireland with its principal business address at Block 8, Harcourt Center, Floor 3, Charlotte Way, 2, Ireland.

57.     BSFX is a Delaware corporation with its principal business address at 383 Madison Avenue, New York, New York 10179.

58.     BSCP is a Delaware corporation with its principal business address at 383 Madison Avenue, New York, New York 10179.

## JURISDICTION AND VENUE

59.     The statutory predicates for the relief requested herein are sections 105, 502 and 553 of the Bankruptcy Code, and rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

60.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

61.     This Court can enter a final order resolving all claims and objections asserted herein within the meaning of 28 U.S.C. § 157(b)(1), and appeals, if any, shall be made pursuant to 28 U.S.C. § 158(a)(1).

## FACTUAL ALLEGATIONS

**A.     JPMorgan Improperly Chose Close-out Dates to its Advantage**

62.     In an effort to inflate its claims against the Lehman Subsidiaries, JPMorgan disregarded the requirements of the Master Agreements and the Bankruptcy Code by

valuing many of the terminated trades as of dates after JPMorgan's designated Early Termination Date of September 15, 2008.

63.     JPMorgan terminated nine of the Master Agreements via letters delivered to the Lehman Subsidiaries on September 15, 2008.[10]  In those letters, JPMorgan designated September 15, 2008 as the Early Termination Date for its Master Agreements.  By designating September 15 as the Early Termination Date, JPMorgan was obligated to value the terminated transactions under these agreements as of that date.

64.     In the COA Master Agreements, the definition of Close-out Amount required that "each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable."  2002 ISDA Master Agreement § 14 ("Close-out Amount" definition).  In the Loss Master Agreements, the definition of Loss states that "a party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practical, as of the earliest date thereafter as is reasonably practical."  1992 ISDA Master Agreement §14 ("Loss" definition).

65.     Section 562 of the Bankruptcy Code also limits the ability of JPMorgan to calculate either a Close-out Amount or Loss as of any date after the Early Termination Date. Section 562(a) of the Bankruptcy Code establishes the general rule that any such determination should be made as of the Early Termination Date.  11 U.S.C. § 562(a).  Section 562(b) then allows an exception only "if there are not any commercially reasonable determinants of value" as of the Early Termination Date, in which case "damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value."  11

---

[10]   BSFX notified LBSF on September 16, 2008 that it was terminating the transactions under the LBSF-BSFX Agreement and designating September 16, 2008 as the "Early Termination Date."

U.S.C. § 562(b). As demonstrated below, there were ample commercially reasonable determinants of value on September 15, 2008, which was the Early Termination Date selected by JPMorgan for all the Master Agreements.

66. Nonetheless, JPMorgan ignored this legal and contractual requirement and valued many of these transactions as of dates after September 15, 2008 instead. As described in detail below, JPMorgan predominantly closed out its portfolio of CDS as of September 17, rates transactions as of September 19, and FX transactions as of an unspecified date after the Early Termination Date. In each case, however, commercially reasonable determinants of value were widely available on September 15. As a result, JPMorgan violated the Master Agreements and the Bankruptcy Code by not valuing its trades as of that date.

**B.     JPMorgan Improperly Charged Add-ons for Hypothetical Losses**

67. JPMorgan also appears to have inflated its claims by including charges for add-ons representing hypothetical losses that it did not incur and never would have incurred. Specifically, JPMorgan included damages in its claims based on certain hypothetical costs and charges that JPMorgan asserts it would have incurred – but did not actually incur – if it had entered into replacement transactions, including, but not limited to: bid-offer charges that were not incurred; liquidity charges that were not incurred; and other hypothetical charges attributed to theoretical replacement transactions that JPMorgan did not enter into following the termination of the transactions under the Master Agreements ("Hypothetical Charges").

> (a)     *JPMorgan's Claims for Hypothetical Charges Violate the Master Agreements*

68. JPMorgan appears to have added a host of add-ons and other charges to the actual mid-market valuations for each of the open trades. Although JPMorgan did not provide Lehman with enough information to determine the total amount of these add-ons,

evidence indicates they are sizeable. One example of an improper add-on reflected in JPMorgan's claims is a "bid/offer" spread, which is the difference in price between the highest price that a buyer is willing to pay for an asset and the lowest price for which a seller is willing to sell it. It appears that JPMorgan closed out its portfolio by valuing many trades at offer prices rather than mid-market prices, each time incorporating a portion of the bid/offer spread into its valuation.

69.     A bid/offer spread only represents a pecuniary loss when a counterparty, usually an end user of a derivative that is not a dealer, actually enters into a replacement trade with a dealer whose price reflects the prevailing bid/offer spread. But JPMorgan, which itself is a market-maker with access to the inter-dealer market, included bid/offer spreads in its claims under the Master Agreements even though it did not actually enter into replacement trades. These Hypothetical Charges are wholly improper because they have no relationship to any actual losses suffered by JPMorgan. When applied across the entire derivatives portfolio they have the effect of inflating JPMorgan's claims by hundreds of millions of dollars.

70.     Not only did JPMorgan impermissibly charge bid/offer spreads on account of non-existent replacement trades, it did so using inflated amounts that would not have been charged even if those replacement trades had occurred. As major derivatives dealers, both JPMorgan and Lehman had access to the inter-dealer market in which dealers trade with one another at or very near mid-market prices. Bid/offer spreads of the magnitude apparently applied by JPMorgan are typical of transactions between dealers and customers or end users. However, given that JPMorgan is a major dealer, any bid/offer spreads charged to JPMorgan would have been very narrow, and in many cases JPMorgan would have profited from the bid/offer spread in

trades with customers. JPMorgan ignored this basic industry practice and charged many extremely wide bid/offer spreads, in yet another attempt to artificially increase its claims.

71. In order to maximize the amount of Hypothetical Charges included in its claims, JPMorgan applied the charges on a transaction-by-transaction basis in many instances, rather than taking into account the loss-mitigating effect of portfolio aggregation by netting offsetting positions. JPMorgan's failure to apply portfolio aggregation when calculating its losses was itself a commercially unreasonable procedure that generated commercially unreasonable results. It was contrary to JPMorgan's own risk management procedures as well as the governing provisions of the COA Master Agreements and Loss Master Agreements.

72. Portfolio aggregation is a widely-accepted practice for the management of derivatives portfolios. This is particularly true for large market-making institutions such as JPMorgan. Derivatives dealers cannot possibly hedge each of the thousands of trades that they enter into with their customers. Instead, they use portfolio aggregation as a means of minimizing hedging costs and managing credit risks. Specifically, portfolio aggregation is used for the purpose of managing the material economic terms of a derivatives portfolio.

73. It is not merely unreasonable, it is utterly inconceivable that JPMorgan would attempt to enter into nearly 75,000 individual replacement trades and incur bid/offer charges on each one when portfolio aggregation would provide the same material economic benefit at a fraction of the cost. In fact, it is contrary to JPMorgan's own risk management practices.

74. JPMorgan, like any other large sophisticated financial institution with significant over-the-counter derivatives positions, managed its risk on an aggregate portfolio basis in the normal course of business. In accordance with this practice, the COA Master

Agreements themselves contemplate that a non-defaulting party will calculate the Close-out Amount for terminated transactions on an aggregate basis. Specifically, "Close-out Amount" is defined as the amount of losses or gains that would be incurred or realized "in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of the Terminated Transaction **or group of Terminated Transactions**, . . . and (b) the options rights of the parties in respect of that Terminated Transaction **or group of Terminated Transactions**." 2002 ISDA § 14 (emphasis added). By explicitly defining Close-out Amount to include groups of terminated transactions, the COA Master Agreements envision that the non-defaulting party will net any offsetting transactions together when calculating the Close-out Amount.

75. When compared with its own risk management practices, JPMorgan's failure to apply portfolio aggregation is not commercially reasonable. By failing to aggregate identical and substantially offsetting transactions together to reach a net risk position, JPMorgan unduly inflated the amount of Hypothetical Charges included in its claims.

76. The Hypothetical Charges included in JPMorgan's claims constitute amounts in excess of the economic equivalent of the terminated transactions and do not correspond to any actual losses. The inclusion of such charges violates the Master Agreements as well as New York law governing contract damages.

      (b)     *The Hypothetical Charges are Not Recoverable under New York Law*

77. The Hypothetical Charges are not only impermissible under the Master Agreements, but are also unenforceable under New York law. Under New York law, to sustain a claim for damages, a claimant must demonstrate actual loss, and the damages being claimed must be commensurate with the amount of actual loss. *Scalp & Blade, Inc. v. Advest, Inc.*, 765 N.Y.S.2d 92, 97 (4th Dep't 2003) (noting that in a cause of action for breach of contract, the

object of compensatory damages, which measure "fair and just compensation, commensurate with the loss or injury sustained from the wrongful act" is to make the plaintiff whole) (internal citations and quotations omitted); *see also Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 382 (1974) ("It is axiomatic that, except where punitive damages are allowable, the law awards damages for breach of contract to compensate for injury caused by the breach . . . . [I]t is equally fundamental that the injured party should not recover more from the breach than he would have gained had the contract been fully performed.").  General contract damages principles provide that damages are meant to put a non-breaching party in the same position it would be "but for" the breach -- not a better position.  *See Freund*, 34 N.Y.2d at 382 (rejecting damages awards that would "place [plaintiff] in a far better position than he would have occupied had the defendant fully performed."); *Madison Fund, Inc. v. Charter Co*., 427 F. Supp. 597, 608 (S.D.N.Y. 1977) ("[O]ne whose contract has been breached is not entitled to be placed, because of that breach, in a position better than that which he would have occupied had the contract been performed.").

78.    In addition, under New York law a non-breaching party must calculate its actual loss as of the date of the breach, and a breaching party is not responsible for any subsequent market fluctuations.  *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) ("New York courts are clear that breach of contract damages are measured from the date of the breach."); *Kovens v. Paul*, 04 CIV. 2238 (TPG), 2009 WL 562280 (S.D.N.Y. Mar. 4, 2009) *aff'd*, 358 F. App'x 228 (2d Cir. 2009) (holding that "changes in value after breach are not relevant to the calculation of damages").  This same principle applies to JPMorgan's calculation of the damages that resulted from the Lehman Subsidiaries' default under the Master Agreements, and is violated by JPMorgan's inclusion of theoretical liquidity charges in its

claims. JPMorgan added these charges to certain positions that it claimed were large relative to the daily trading volume of the relevant instrument. But the prices of these positions had the potential to increase as well as decrease, and both of these possibilities were already incorporated into the market prices on the date of the breach. By holding the positions instead of entering into replacement trades, while at the same time charging the Lehman Subsidiaries hypothetical liquidity charges to protect against a price decline, JPMorgan retained the upside market potential and forced the Lehman Subsidiaries to protect it against the downside risk. This one-sided approach provided a windfall to JPMorgan, penalized the Lehman Subsidiaries, and was impermissible under New York law.

79. JPMorgan's conduct is also impermissible under New York law for violating the implied covenant of good faith and fair dealing. Implicit in all New York law governed contracts is "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (internal quotation marks omitted). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* The methodology used by JPMorgan in calculating certain Close-out Amounts and Loss amounts without applying portfolio aggregation represents an irrational exercise of discretion in construing the Master Agreements. JPMorgan, as a sophisticated market participant, accounted for risk exposure with the Lehman Subsidiaries on an aggregate portfolio basis in the normal course of business. Nonetheless, JPMorgan failed to apply portfolio aggregation in its calculation of the Loss and Close-out Amounts. JPMorgan's attempts to maximize damages by using a methodology to calculate these amounts that is neither commercially reasonable nor consistent with its own risk management

practices demonstrates an irrational exercise of discretion in construing the Close-out Amount and Loss provisions, as well as a lack of good faith in honoring and discharging its obligations under the terms of the Master Agreements.

80.     Furthermore, JPMorgan's failure to take into account the loss mitigating effects of portfolio aggregation contradicted New York law principles requiring mitigation of damages.  When proving damages in a breach of contract claim, a claimant must necessarily demonstrate that it fulfilled its duty to expend reasonable efforts to mitigate the damages claimed.  *See Williams v. Bright*, 658 N.Y.S.2d 910, 911-12 (1st Dep't 1997) ("For a hundred years it has been settled law in this state that a party who claims to have suffered damage . . . is bound to use reasonable and proper efforts to make the damage as small as practicable and if an injured party allows the damages to be unnecessarily enhanced, the incurred loss justly falls upon him.") (internal citations and quotations omitted);  *Korea Life Ins. Co., Ltd. v. Morgan Guaranty Trust Co.*, No. 99 Civ. 12175 (AKH), 2004 WL 1858314, at *7 (S.D.N.Y. Aug. 20, 2004) ("[T]he party seeking damages is under the duty to make a reasonable effort to avoid consequences of the act complained of.  It is, indeed, a rule of broad acceptance that no recovery may be had for losses which the person injured might have prevented by reasonable efforts and expenditures.") (internal quotation marks omitted); *Lund v. Chem. Bank*, 797 F. Supp. 259, 271 (S.D.N.Y. 1992) ("A party generally is not . . . allowed to recover for a loss which it could have reasonably mitigated itself.").

81.     This well-recognized principle of mitigation of damages dictates that a commercially reasonable damages calculation must include portfolio aggregation.  The use of portfolio aggregation in the calculation of damages results in a measure of damages that represents actual mitigation efforts undertaken by parties through hedging risk, taking what

would otherwise be an inflated gross claim and yielding a reduced net claim that more closely reflects the actual injury suffered by the injured party. By failing to net offsetting positions in calculating its claims and by including Hypothetical Charges on a transaction-by-transaction basis, JPMorgan failed to take into account the mitigating effects of portfolio aggregation.

82.     Any argument by JPMorgan that the Close-out Amount and Loss provisions are liquidated damages clauses that allow for these types of add-ons and Hypothetical Charges must be rejected. That interpretation of the Close-out Amount and Loss provisions would be contrary to New York law, which only recognizes as valid liquidated damages provisions that fix a pre-estimate of damages at the time of contracting. *See Jarro Bldg. Indus. Corp. v. Schwartz*, 281 N.Y.S.2d 420, 426 (2d Dep't 1967) (stating that "a liquidated damages provision to be valid must fix the damages in advance and be for an amount certain" (citing *Frankel's Carpet Fashions, Inc. v. Abraham*, 228 N.Y.S.2d 123 (Sup. Ct. Nassau County 1962))).

83.     However, even if the Close-out Amount and Loss provisions were to be construed as liquidated damages clauses, recovery of the Hypothetical Charges would still be impermissible under New York law because they would constitute a penalty. Whether a damages provision is in fact an unenforceable penalty is a question of state law. *See In re Ionosphere Clubs, Inc.*, 262 B.R. 604, 613 (Bankr. S.D.N.Y. 2001). Under New York law, "contractual terms providing for the payment of a sum disproportionate to the amount of actual damages exact a penalty and are unenforceable." *Id.* at 614. New York has a strong public policy against the enforcement of such penalty clauses. A contractual provision that provides specific consequences to a breaching party operates as an unenforceable penalty unless both: (1) the damages from the breach were difficult to ascertain at the time the parties entered into the

contract; and (2) the consequences from the breach bear a reasonable relationship to the amount of damages that would be expected to result from the breach. *See In re MarketXT Holdings Corp.*, 376 B.R. 390, 416-17 (Bankr. S.D.N.Y. 2007) (invalidating prepayment penalty because "it bore no reasonable relationship to any damages that could have been suffered by Defendants"). "Moreover, courts should resolve any reasonable doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damages clause in favor of a construction which holds the provision to be a penalty." *In re Ionosphere*, 262 B.R. at 614.

84. Neither of these requirements is met here. First, the actual damages that would be incurred as a result of a default under the Master Agreements were readily ascertainable at the time the contracts were entered into – they would be the mid-market values of the transactions under each Master Agreement. Second, JPMorgan's claims significantly departed from these actual damages by seeking recovery for Hypothetical Charges that do not correspond to any loss JPMorgan suffered. As a result, JPMorgan's inclusion of Hypothetical Charges in its Loss and Close-out Amount calculations constitutes an unenforceable penalty under New York law.

      (c)    *JPMorgan's Claims for Hypothetical Charges Are Unenforceable Penalties that are Disallowed or Subordinated in Priority of Payment Under the Bankruptcy Code*

85. To the extent JPMorgan's claims are penalties, they are subject to disallowance under the Bankruptcy Code. Section 502(b)(1) of the Bankruptcy Code provides for disallowance of claims that are not enforceable under state law. *See* 11 U.S.C. § 502(b)(1) (stating that a claim shall not be allowed if it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured").

86.     As noted above, the Close-out Amount and Loss provisions are not enforceable as liquidated damages provisions under New York state law.  Thus, section 502(b)(1) of the Bankruptcy Code mandates disallowance JPMorgan's claims for Hypothetical Charges.  *See, e.g.*, _In re Premier Enter. Biloxi, LLC_, 413 B.R. 370, 374 (Bankr. S.D. Miss. 2009) (disallowing claim for liquidated damages under lease pursuant to section 502(b)(1) of Bankruptcy Code when lease provision was not enforceable under state law); _In re Ionosphere Clubs, Inc._, 262 B.R. 604, 613-14 (Bankr. S.D.N.Y. 2001) (capping indemnity at tax rate in effect at time of alleged default rather than contractual rate provided for under tax benefit transfer agreement because tax rate in effect represented actual loss; noting "courts should resolve any reasonable doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damages clause in favor of a construction which holds the provision to be a penalty").

87.     Pursuant to the claims, JPMorgan seeks to recover Hypothetical Charges that were not actually incurred.  Thus, instead of compensating JPMorgan for actual, pecuniary loss it may have suffered, they simply penalize the Lehman estates.  The Bankruptcy Code disfavors such claims that are in the nature of penalties, subjecting them to disallowance or subordination in priority of payment.

88.     For example, while section 506(b) of the Bankruptcy Code allows an oversecured creditor "reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose," claims for those charges (*e.g.*, prepayment premiums) are disallowed to the extent that they constitute penalties and fail to correspond to actual damages.[11] *See* 11 U.S.C. § 506(b); *In re Schwegmann Giant Super Markets,* 287 B.R. 649, 655-56 (E.D. La. 2002) (disallowing prepayment penalty under section 506(b) of Bankruptcy Code that

---

[11]     Plaintiffs do not concede that any of the Defendants are oversecured creditors.

constituted over 18% of prepaid loan balance); *In re Vest Assocs.*, 217 B.R. 696, 702-03 (Bankr.

S.D.N.Y. 1998) (disallowing secured creditor's claim for postpetition interest at default rate

where default rate set so high as to be deemed a "disguised" penalty against junior creditors); *In*

*re Duralite Truck Body & Container Corp.*, 153 B.R. 708, 714 (Bankr. D. Md. 1993)

(disallowing claim for prepayment charges in loan agreement where such charges were not tied

to actual damages likely to be incurred by lender upon a prepayment and holding that "[a]

prepayment charge formula must effectively estimate actual damages, otherwise, the charges

may operate as a either a penalty on the debtor or a windfall to a lender at the expense of other

creditors of the bankruptcy estate").

   89. Similarly, the Bankruptcy Code differentiates between claims that

compensate for actual loss and those that are simply punitive and non-compensatory, subjecting

the latter category of claims to subordination in priority of payment.  *See* 11 U.S.C. §

507(a)(8)(G) (affording eighth priority to "allowed unsecured claims of governmental units, only

to the extent that such claims are for . . . . (G) a penalty related to a claim of a kind specified in

this paragraph and in compensation for actual pecuniary loss"); *id.* § 726(a)(4) (subordinating to

all other claims, claims for fines, penalties, or forfeitures "to the extent that such fine, penalty,

forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of

such claim").[12]  Indeed, claims for fines, penalties, or forfeiture that are not compensatory are

subordinated below late filed claims under section 726(a)(3) of the Bankruptcy Code.  *See* 11

U.S.C. § 726(a)(3).

---

[12] *Cf.  Schultz Broadway Inn v. United States*, 912 F.2d 230, 234 (8th Cir. 1990) (applying section
726(a)(4) in chapter 11 case and affirming lower court's holding that general unsecured creditors who
suffered actual losses should be paid in priority to a claim for non-pecuniary tax loss penalty; this holding
"accords with the legislative history of the Bankruptcy Reform Act [of 1978], which generally prefers
claims for actual losses over purely punitive claims.").

90.     Because the Hypothetical Charges are commercially unreasonable, unenforceable under New York law, and unenforceable under the Bankruptcy Code, the Hypothetical Charges should be disallowed in their entirety.

## C.     JPMorgan's Claims Should Be Disallowed Under the Stipulation

91.     On July 2, 2009, this Court entered the Bar Date Order, which required Lehman's derivative counterparties to submit certain information relating to their proofs of claim, and the Stipulation, which, among other things, exempted JPMorgan from certain provisions of the Bar Date Order that would have otherwise required them to submit information relating to their proofs of claim.

92.     Pursuant to the Stipulation, however, JPMorgan was still required to submit information in response to a written request from Lehman for information that had not already been provided by JPMorgan.  Specifically, the Stipulation provided:

> No claim arising from a JPM Derivative Contract or related Guarantee shall be disallowed on the basis that JPM failed to provide information required by the Bar Date Order or this Stipulation unless (i) the Debtors specifically identify such information as not having been already provided by JPM and request in writing that JPM provide such information and (ii) JPM shall have failed to provide such information by the later of the Bar Date (or such later deadline established by the Bar Date Order for the completion and submission of the Derivative Questionnaire) or 30 days after JPM's receipt of such request.

Stipulation at ¶ 2.

93.     On May 10, 2010, Lehman requested via email that JPMorgan provide information necessary for the analysis of JPMorgan's claims under the Master Agreements.  The parties met and conferred on this issue without resolution.  On October 20, 2010, Lehman provided formal written notice requesting that JPMorgan provide specifically-identified

information concerning the JPMorgan Claims that had not yet been provided by JPMorgan.[13] After meeting and conferring on November 19, 2010, JPMorgan agreed to provide certain of the requested information. Specifically, JPMorgan agreed to provide: revised trade populations and recalculated claims by Master Agreement; the close-out date for each trade (if known); September 15, 2008 mid-market closing prices by trade; mid-market closing prices for each trade as of the date prior to the close-out of that trade; add-ons by desk and product group, as well as any specific trade adjustments of which it was aware; and Level 2 data mapping by trade.

94. Lehman never received much of the information promised during the November 19 meeting. Specifically, JPMorgan never provided: recalculated claims by Master Agreement; the close-out date for each trade; September 15, 2008 mid-market closing prices for each trade; mid-market closing prices for each trade as of the date prior to the close-out of that trade; and add-ons by desk and product group.

95. Lehman has repeatedly informed JPMorgan that without this information, a complete analysis of the JPMorgan Claims is not possible. Critically, without mid-market values for each trade it is impossible to determine the amount of Hypothetical Charges or other add-ons included in the JPMorgan Claims. It is similarly impossible to corroborate the exact dates and times as of which JPMorgan closed out each trade. None of Lehman's other big bank counterparties has withheld so much of the information necessary to understand its close-out process.

96. JPMorgan never provided this information, and thus failed to comply with Lehman's written request pursuant to the Stipulation. The Bar Date has passed and well over 30

---

[13] *See* letter from L.P. Harrison to Harold S. Novikoff, Oct. 20, 2010 (attached hereto as Exhibit D).

days have elapsed since Lehman requested this information. Therefore, the JPMorgan Claims should be disallowed pursuant to the Bar Date Order and the Stipulation.

**D.** **JPMorgan Did Not Use Commercially Reasonable Procedures to Close Out its CDS Portfolio with Lehman**

97.     JPMorgan artificially inflated its claims arising from Credit Default Swaps ("CDS") with LBSF by more than $1.35 billion, in violation of the Master Agreements, New York law, and the Bankruptcy Code. Almost all of the CDS transactions between JPMorgan and the Lehman Subsidiaries were entered into under the LBSF-JPMCB Agreement. The two largest components of this portfolio, which totaled approximately 45,000 CDS, were single name CDS (39,214 trades) and index CDS (3,834 trades). At the close of business on September 12, 2008, this portfolio of CDS had a net mark-to-market value of approximately $1.2 billion in LBSF's favor. As illustrated in the table below, JPMorgan submitted claims for these CDS in an amount more than $1.35 billion more favorable to JPMorgan than the values calculated by Lehman from readily available market data.

| Close-out Amount Calculations for CDS under LBSF-JPMCB Agreement [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Category | No. Trades | JPMCB Calculation of Close-out Amount | Market-Based Calculation of Close-out Amount | Difference |
| Single Name CDS | 39,214 | 1,556,171,701 | 2,292,712,588 | 736,540,887 |
| Index CDS | 3,834 | (891,658,887) | (653,973,885) | 237,685,002 |
| CDO | 78 | (908,522,837) | (737,269,795) | 171,253,042 |
| Index Tranche | 1,390 | 150,347,966 | 309,436,769 | 159,088,803 |
| Single Name LCDS | 349 | (62,730,051) | (35,493,190) | 27,236,860 |
| Spread Option | 34 | 2,603,851 | 16,366,884 | 13,763,032 |
| Index Tranche PO | 42 | 120,857,585 | 131,148,272 | 10,290,687 |
| Other | 70 | (6,234,528) | (6,290,386) | (55,858) |
| **TOTAL** | 45,011 | (39,165,200) | 1,316,637,255 | 1,355,802,455 |

98.     JPMCB employed a number of commercially unreasonable procedures to alter CDS close-out values.  First, JPMCB willfully manipulated the close-out date, valuing this portfolio as of at least three separate days before finally settling on the most lucrative date – despite the fact that the Master Agreements and Bankruptcy Code mandated that JPMCB close out the portfolio as of September 15.  Second, JPMCB valued CDS in an entirely inconsistent manner, based on which party was the buyer of credit protection.  This resulted in a pattern of Close-out Amounts that illogically reflect the value of credit protection simultaneously increasing when it was owned by JPMCB and decreasing when it was owned by LBSF.  Third, JPMCB failed to apply principles of portfolio aggregation and instead included exaggerated hypothetical charges to value identical trades inconsistently to its own advantage. These improper procedures violated the Master Agreements and the Bankruptcy Code and inflated JPMCB's claim by more than $1.35 billion.

(a)     *JPMCB Improperly Chose the Close-out Date to its Advantage*

99.     JPMCB initially valued its CDS portfolio with LBSF as of September 15, which JPMCB designated as the Early Termination Date for trades under the LBSF-JPMCB Agreement.  However, JPMCB subsequently discarded those values and re-marked the same trades as of September 16 and again as of September 17, in each case to capture certain market movements in its favor.  JPMCB then used the valuations from September 17 – the most lucrative of the three valuations for JPMCB – for the purpose of calculating its claim.  By closing out these trades as of a date other than the Early Termination Date, JPMCB violated the Master Agreement and the Bankruptcy Code.  *See* 2002 ISDA ¶ 14; 11 U.S.C. § 562(a)-(c).  Although JPMCB's CDS claims are based on close-out values as of September 17, commercially reasonable determinants of value existed for the CDS portfolio as of September 15, as

established by the fact that JPMCB did in fact perform a full valuation of the portfolio as of that date.

100.    Internal email correspondence at JPMCB makes clear that it re-marked its CDS portfolio on September 16 and 17 specifically to increase the value of its claims.  On September 15, Jeremy Barnum, a Managing Director at JPMCB with responsibility in the North American Credit Trading business, reported, "I closed out North American Credit Trading as of 12:55 PM EST."[14]  The next day, Barnum reported closing out the same portfolio a second time, writing, "Considering the extremely high level of intraday volatility today and the ongoing news in Credit Markets, I wanted to memorialize that we have closed out the vast majority of the NACT Lehman related risk as of approximately 11 AM this morning."[15]  Finally, on September 17 Barnum disclosed that he was re-marking the portfolio yet again, and explained he was doing so specifically to capture increased profit for JPMCB.  He wrote, "Pnl with lehman trades would be up 50 instead of down 50.  As a result I am going to change the claim to tonight's levels."[16]

101.    Given that commercially reasonable determinants of value existed on September 15, JPMCB was obligated to value the CDS portfolio as of that date.  Its decision to re-mark the portfolio as of subsequent days in order to capture increased profits violates the Master Agreement and the Bankruptcy Code, and exemplifies JPMorgan's lack of good faith and commercial reasonableness in constructing its derivatives claims against LBSF.

---

[14]   Email from Jeremy Barnum (JPMCB) to Rob O'Rahilly (JPMCB), Sept. 15, 2008 [JPM-LBHI00615976] (attached hereto as Exhibit E).

[15]   Email from Jeremy Barnum (JPMCB) to Don Thompson (JPMCB), *et al.*, Sept. 16, 2008 [JPM-LBHI00573876] (attached hereto as Exhibit F).

[16]   Email from Jeremy Barnum (JPMCB) to Daniel Pinto (JPMCB), Sept. 17, 2008 [JPM-LBHI00619389] (attached hereto as Exhibit A).

        (b)      *JPMCB Valued CDS Trades Inconsistently Based on which Party was the Buyer of Credit Protection*

102.     In addition to manipulating the close-out date, JPMCB valued the CDS portfolio in an entirely inconsistent manner, based on which party was the buyer of credit protection. Specifically, JPMCB submitted Close-out Amounts that reflect the value of credit protection increasing if it was owned by JPMCB but decreasing if it was owned by LBSF. This result is illogical, and indicates intentional manipulation of the CDS close-out valuations by JPMCB.

103.     This inconsistency in JPMCB's valuations is unmistakable when the single name CDS and index CDS portfolios are compared. In the case of single name CDS, LBSF was predominantly a ***buyer*** of credit protection from JPMCB. Most of the reference entities that were covered by these single name CDS were not financial institutions. During the week of September 15, 2008, prices of CDS written on financial institutions were very volatile, but prices of CDS written on non-financial institutions experienced much less volatility. During that week, this single name CDS position of LBSF should have increased in value as credit protection spreads widened (*i.e.* credit protection generally became more expensive to purchase). According to Lehman's internal mark-to-market calculations,[17] the value of the single name CDS portfolio was in LBSF's favor at the close of business on September 12 by $2.04 billion, which

---

[17] All of Lehman's mark-to-market calculations of its single name and index CDS positions with JPMCB are based on data provided by Markit Partners, which is a private company headquartered in London. On information and belief, JPMCB is one of several financial institutions that has an equity holding in Markit Partners and JPMCB regularly uses data provided by Markit Partners for JPMCB's risk management and internal mark-to-market systems. Markit Partners data is widely used and relied on in the CDS market. Markit Partners provides users of its data with a CDS end-of-day service that aggregates valuation information for the credits that trade in the CDS market, drawn from numerous sources including inter-dealer brokers, electronic trading platforms, major market makers, and many significant buy side firms. Markit Partners aggregates over one million data points daily using sophisticated algorithms to create a single, independent, reliable source of price data for CDS on a large number of single names and for CDS on standard credit indices.

increased to $2.428 billion by September 17. However, JPMCB closed out this portfolio as of September 17 at a value of $1.557 billion in LBSF's favor – a decrease of almost $500 million to LBSF from September 12.

104. In contrast to the single name CDS portfolio, for index CDS LBSF was predominantly a **_seller_** of credit protection to JPMCB. As with the single name CDS, during the week of September 15, 2008, this index position should have become more valuable to the net purchaser of protection, which for this portfolio was JPMCB. Using the Lehman's internal mark-to-market calculations, the index CDS portfolio was of negative value to LBSF at the close of business on September 12 in the amount of $400 million and decreased to negative $683 million by September 17. JPMCB closed out this portfolio of index CDS as of September 17 at a value of negative $890 million to LBSF – a decrease of almost $500 million to LBSF from September 12.

105. Thus, according to JPMCB's close-out valuations, the value of owning credit protection in the relevant CDS increased after September 12 when JPMCB owned the protection but decreased when LBSF owned the protection, as depicted graphically below:



**Value of Credit Protection**

106. JMPCB's close-out valuations are inconsistent not only between the single name CDS and index CDS portfolios, but within each portfolio as well. For example, the table below compares close-out values for two particular High Yield indices. These two indices are made up of the exact same components. In fact, the two indices are identical in every characteristic except for maturity date. The DJCDX-NAHS7-5Y index matured on December 2011, five years from its issuance, while the DJCDX-NAHS7-7Y is the same exact index but with a maturity date of December 2013, seven years from its issuance.

| Comparison of two "High Yield" Indices in LBSF-JPMCB Agreement<br>[values in USD to LBSF] | | | | | | |
|---|---|---|---|---|---|---|
| Index | No. Trades | Notional | Portfolio Value on September 12, 2008 ($) | JPMCB Calculation of Close-out Amount ($) | Market-Based Calculation of Close-out Amount | Difference |
| DJCDX-NAHS7-5Y | 29 | (466,710,750) | (20,922,454) | (33,669,751) | (31,269,180) | 2,400,572 |
| DJCDX-NAHS7-7Y | 26 | 352,489,120 | 26,402,663 | 18,657,212 | 35,985,690 | 17,328,478 |
| **Total** | **55** | (114,221,630) | 5,480,209 | (15,012,539) | 4,716,510 | 19,729,049 |

107.     LBSF was a net seller of protection on the DJCDX-NAHS7-5Y index and a net buyer of protection on the DJCDX-NAHS7-7Y index.  As illustrated in the table above, these positions largely offset and at the end of the day on September 12, 2008, the combined positions had a net value of approximately $5.5 million in LBSF's favor.  On September 15, 2008, LBSF calculated that the net value of the two positions had decreased to $4,716,510 in LBSF's favor.  However, JPMCB submitted a net close-out value of over $15 million against LBSF, remarkably calculating that the value of its purchase of protection in the five-year index and its sale of protection in the seven-year index had each moved in its favor.  As explained above, such a result is logically impossible due to the identical components in the two indices.

108.     Moreover, because the two indices are identical except for maturity date, in every circumstance a trade referencing the index maturing in December 2013 would be more valuable for the purchaser of protection than an equivalent trade referencing the index maturing in December 2011.  In other words, the index maturing in 2013 offers the exact same protection as the index maturing in 2011, except that it provides that protection for an additional two years.  Consequently that longer protection is always more valuable.  Indeed, LBSF's valuations reflect this, as illustrated in the table below.

| Comparison of two "High Yield" Indices in LBSF-JPMCB Agreement as a Percent of Notional [values in USD to LBSF] | | | | | |
|---|---|---|---|---|---|
| Swap Agreement | No. Trades | Maturity Date | JPMorgan Entities Calculation of Close-out Amount as a Percent of Notional (%) | LBSF Calculation of Proper Close-out Amount as a Percent of Notional (%) | Notional ($) |
| DJCDX-NAHS7-5Y | 29 | December 2011 | 7.21% | 6.70% | (466,710,750) |
| DJCDX-NAHS7-7Y | 26 | December 2013 | 5.29% | 10.21% | 352,489,120 |

109.     LBSF calculated the value of the CDS referencing the index maturing in December of 2011 to be 6.70% of the notional.  LBSF calculated the value of the CDS based on

the longer dated index, December 2013, to be 10.21% of notional. JPMCB's close-out values do not reflect the same financial logic. Shockingly, JPMCB calculated the value of the longer dated December 2013 index to be *less* than the value of the shorter dated December 2011 index. It is not possible that CDS based on the December 2013 index were less valuable than CDS based on the December 2011 index, yet this is exactly what JPMCB submitted in its claims.

110. JPMCB's egregious profiteering in closing out its CDS portfolio demonstrates bad faith as it defies both market logic and common sense. It was not commercially reasonable, and it dramatically and artificially inflated JPMCB's CDS claims.

(c) *JPMCB Included Hypothetical Charges in its CDS Claims and Failed to Apply Portfolio Aggregation as Required by Commercially Reasonable Procedures*

111. JPMCB included exaggerated hypothetical bid/offer charges in its Close-out Amounts for the CDS portfolio. These excessive charges do not correspond with any losses that JPMCB ever incurred. In addition, JPMCB failed to apply an adequate level of portfolio aggregation, effectively adding these Hypothetical Charges to a vast majority of its individual CDS transactions. The combined effect of this commercially unreasonable behavior was a massive inflation of JPMCB's claim.

112. JPMCB's lack of portfolio aggregation was so extreme that in many instances JPMCB did not aggregate trades that were identical or almost identical in every regard except for direction. This can be seen in numerous examples across the entire CDS portfolio. The pattern is most apparent in pairs of trades where JPMCB embedded hypothetical charges to calculate a higher value for a CDS where it was the buyer of protection and a lower value where LBSF was the buyer of protection, even though the trades were otherwise identical. Set forth below are four examples in which JPMCB failed to apply portfolio aggregation and instead

padded its claims by submitting different values for economically identical transactions where the only difference was whether LBSF was the buyer or the seller of credit protection.

Example One

| Argentina - Single Name CDS | | | | |
|---|---|---|---|---|
| Reference Entity | LBSF Buys/Sells Protection | USD Notional ($) | Maturity Date | JPMCB Close-out Amount ($) |
| Argentina | Buy | 5,000,000 | 5/20/2012 | 933,984 |
| Argentina | Sell | 5,000,000 | 5/20/2012 | (1,435,431) |
| | | | Net Charge To LBSF | (501,447) |

Example Two

| GMACLL - Single Name CDS | | | | |
|---|---|---|---|---|
| Reference Entity | LBSF Buys/Sells Protection | USD Notional ($) | Maturity Date | JPMCB Close-out Amount ($) |
| GMACLL | Buy | 10,000,000 | 6/20/2013 | 4,337,248 |
| GMACLL | Sell | 10,000,000 | 6/20/2013 | (5,135,332) |
| | | | Net Charge To LBSF | (798,084) |

Example Three

| PMI - Single Name CDS | | | | |
|---|---|---|---|---|
| Reference Entity | LBSF Buys/Sells Protection | USD Notional ($) | Maturity Date | JPMCB Close-out Amount ($) |
| PMI | Buy | 10,000,000 | 9/20/2013 | 2,260,521 |
| PMI | Sell | 10,000,000 | 9/20/2013 | (2,944,444) |
| | | | Net Charge To LBSF | (683,923) |

Example Four

| CDX IG Series 7 - Index CDS | | | | |
| --- | --- | --- | --- | --- |
| Reference Entity | LBSF Buys/Sells Protection | USD Notional ($) | Maturity Date | JPMCB Close-out Amount ($) |
| CDX_IG Series 7   Buy | Buy | 500,000,000 | 12/20/2011 | 21,866,600 |
| CDX_IG Series 7   Sell | Sell | 500,000,000 | 12/20/2011 | (31,553,434) |
| | | | Net Charge To LBSF | (9,686,834) |

113.    There is simply no justification for JPMCB to apply different values to pairs of economically identical transactions when the only variable is whether LBSF was the buyer or seller of credit protection.  The four pairs of trades described above are representative of a general pattern that inflated JPMCB's claim by hundreds of millions of dollars.

114.    Analysis of JPMCB's close-out of the index CDS portfolio under the LBSF-JPMCB Agreement further demonstrates how JPMCB's lack of portfolio aggregation resulted in a significant inflation of its claims.  This portfolio contained CDS written on 244 different indices.  The table below shows the 15 indices with the largest differences between JPMCB's Close-out Amounts and the values calculated by LBSF using available market data. The top 15 largest valuation differences alone make up $220 million of the total $237 million overstatement.

| Largest Vaaluation Differences by Index for LBSF-JPMCB Agreement [values in USD to LBSF] | | | | | |
|---|---|---|---|---|---|
| Index | Maturity Date | No. Trades | JPMorgan Entities Calculation of Close-out Amount ($) | LBSF Calculation of Proper Close-out Amount ($) | Difference ($) |
| CDX-NAHYS10-5Y | 6/20/2013 | 66 | (308,417,233) | (265,839,058) | 42,578,175 |
| DJCDX-NAIGS7-5Y | 12/20/2011 | 33 | 18,395,475 | 41,342,206 | 22,946,731 |
| DJCDX-NAIGS6-5Y | 6/20/2011 | 13 | 44,159,893 | 61,523,588 | 17,363,695 |
| DJCDX-NAHYS7-7Y | 12/20/2013 | 26 | 18,657,212 | 35,985,690 | 17,328,478 |
| CDX-NAIGS8-5Y | 6/20/2012 | 35 | (144,125,560) | (127,721,280) | 16,404,280 |
| ITRAXX-EUROPES9-5Y | 6/20/2013 | 124 | 22,080,060 | 36,484,799 | 14,404,738 |
| CDX-NAIGHVOLS9-5Y | 12/20/2012 | 11 | (123,643,770) | (109,357,239) | 14,286,530 |
| LCDXNAS8-5Y | 6/20/2012 | 11 | 17,072,077 | 30,285,953 | 13,213,875 |
| DJCDX-NAHYS6-5Y | 6/20/2011 | 15 | 34,362,398 | 45,528,767 | 11,166,369 |
| DJCDX-NAIGS4-10Y | 6/20/2015 | 8 | 47,048,364 | 56,992,040 | 9,943,676 |
| ITRAXX-XOVERS7-5Y | 6/20/2012 | 164 | 39,059,315 | 48,709,249 | 9,649,934 |
| DJCDX-NAHYS5-5Y | 12/20/2010 | 6 | (3,512,282) | 5,112,311 | 8,624,593 |
| ITRAXX-EUROPES4-5Y | 12/20/2010 | 45 | (42,399,545) | (34,060,853) | 8,338,692 |
| ITRAXX-EUROPES6-5Y | 12/20/2011 | 36 | 215,550,079 | 222,783,928 | 7,233,849 |
| CDX-EMS8-5Y | 12/20/2012 | 29 | 11,075,509 | 17,877,980 | 6,802,471 |
| Remaining 229 Indices | | 3,212 | (737,020,879) | (719,621,964) | 17,398,915 |
| **Total** | | 3,834 | (891,658,887) | (653,973,885) | 237,685,002 |

115.    A particularly egregious example of the claim inflation caused by JPMCB's failure to apply portfolio aggregation can be seen by examining the indices with the second and fifth largest differences above.  The rows have been highlighted for ease of identification.

116.    The highlighted examples are each Markit CDX North American Investment Grade indices, comprised of 125 different investment grade corporate entities domiciled in North America that trade with relatively strong liquidity in the CDS market.  The index labeled DJCDX-NAIGS7-5Y had a maturity date of December 20, 2011, while the index labeled  CDX-NAIGS8-5Y had a maturity date of June 20, 2012, or six months later.  Most importantly, 118 of the 125 entities within each index were identical.  In other words, the composition of the two indices overlapped by more than 94%.  The graph below shows the price level for these two indices from March 20, 2007 to September 30, 2008.



**99.76% Correlation bet CDXIG-7 5yr and CDXIG-8 5yr**

117.    The graph clearly shows the strong relationship between these two particular indices, whose prices movements tracked one another with nearly 100 percent correlation.  This is not surprising, since more than 94 percent of the names making up each index were identical.  In addition, the indices were designed in such a way that the remaining names had similar characteristics to the 118 entities that were the same in each index.

118.    JPMCB was a net seller of protection in one index and a net buyer of protection in the other.  As a result, JPMCB's long protection position in one index provided a natural and powerful hedge for JPMCB's short position in the other.  But JPMorgan ignored the risk mitigation provided by these offsetting positions and instead priced each index individually, embedding inflated Hypothetical Charges within each, which inflated JPMCB's claim by millions of dollars on these two positions alone.  JPMCB's own subsequent actions further

support the commercial reasonableness of applying portfolio aggregation here, as JPMCB did not replace these individual index positions.

119.     By ignoring portfolio aggregation, JPMCB is attempting to create the false impression that it would have had to enter into a significant number of trades to replace the economic equivalent of its CDS portfolio with LBSF. JPMCB's own actions demonstrate the disingenuousness of this position. JPMCB did not enter into replacement trades because the economic risk it was facing was actually significantly less than what it is attempting to portray in its claims. JPMCB was the beneficiary of substantial portfolio effects because it had CDS positions with LBSF that were significantly offsetting.

(d)     *Combined Effects of JPMCB's Improper Actions*

120.     The actions described above are typical of the behavior that JPMCB engaged in to inflate the close-out value of its CDS portfolio materially and unfairly in its favor. The net result was the creation of a complicated series of overstated claims. Two examples from the single name CDS portfolio – CDS on the reference entities GMAC and Morgan Stanley – illustrate these practices. These reference entities produced the two largest valuation differences with Lehman for single name CDS under the LBSF-JPMCB Agreement, at approximately $74 million and $51 million, respectively.

(i)     *Portfolio of trades based on GMAC*

121.     At the time of LBHI's bankruptcy, LBSF and JPMCB had a portfolio of 473 CDS referencing GMAC, with a common set of economic characteristics. The portfolio was fairly evenly balanced with a large number of buys and sells, and a small net exposure. Using readily available market information, Lehman is able to estimate the value of the credit

protection as a percent of notional amount for each individual trade, which are illustrated below in order of maturity.



122.     The smooth green series of dots is the value calculated by Lehman for GMAC CDS at each of the standard maturity dates.  It is based on information provided by Markit Partners for September 15, 2008.  The pricing curve received a "AA" rating from Markit indicating that a large number of market participants had submitted pricing curves and that the curves were all relatively similar.  The LBSF curve has a logical progression in that the value of the credit protection gradually increases over time.

123.     The red diamonds on the above graph are JPMCB's valuations of GMAC CDS where LBSF sold protection to JPMCB.  The blue triangles are JPMCB's valuations of GMAC CDS where LBSF bought protection from JPMCB.  The graph shows significant anomalies in JPMCB's prices.  First, JPMCB used inconsistent pricing for CDS with the same

maturity date.  Specifically, JPMCB has inexplicable internal pricing differences of over 25 percent of notional on trades with identical maturities, where the value of the credit protection should be identical.  Second, JPMCB has valued some of these CDS at more than 70 percent of their notional value.  These values are irrational in that they are greater than the assumed maximum loss that the market was using in its pricing at the time.  The net result of JPMCB's inconsistent pricing was an inflation of more than $74 million in the close-out values for these CDS.

(ii)  <em>Portfolio of trades based on Morgan Stanley</em>

124. At the time of LBHI's bankruptcy, LBSF and JPMCB also had a portfolio of 141 CDS referencing Morgan Stanley, with a common set of economic characteristics.  Like the GMAC portfolio, this portfolio was also fairly evenly balanced with a large number of buys and sells, and a small net exposure.  The graph below shows the value of the protection (as a percent of notional) for each trade, with the trades again in order of maturity.



125.    This graph again shows pricing anomalies by JPMCB, with two distinct groupings apparent.  These Morgan Stanley CDS were held by five different JPMorgan trading desks.  Two trading desks held most of the 141 positions, with 79 and 52 trades respectively.  The remaining three trading desks had a total of 10 trades.  The different close-out values submitted by the two main trading desks are clearly visible in the graph.  One group forms a relatively smooth line on the upper part of the graph.  The second group forms a relatively smooth line slightly below the green dots representing LBSF values.

126.    The two trading desks with the largest number of trades had opposite and largely offsetting positions.  The trading desk with 79 trades held a net purchase of protection with an exposure of approximately $82,000 for each basis point change in Morgan Stanley's credit spread.  The trading desk with 52 trades held a net sale of protection with an exposure of

approximately $77,000 for each basis point change in credit spread. The net exposure of the two trading desks was extremely small – less than $5,000 for each basis point change.

127.     Lehman valued the combined portfolio of the two main trading desks at $1.2 million in JPMCB's favor as of September 12, 2008 and at $3.4 million in favor of JPMCB on September 15, 2008. This $2.2 million change in value is consistent with the market changes in credit spreads for Morgan Stanley during that time.

128.     JPMCB's close out values were very different. Remarkably, each trading desk submitted close out values that were favorable to JPMCB. Whereas Lehman's valuations were consistent, the JPMCB trading desk that was long credit protection consistently valued the protection at a higher level than Lehman, and the trading desk that was short credit protection consistently valued the protection at a lower level than Lehman.

129.     The two single name CDS examples shown – GMAC and Morgan Stanley – illustrate just how far from commercial reality JPMorgan was willing to go in order to close out the CDS portfolio in its favor. The claim submitted by JPMCB for the CDS portfolio was completely divorced from the actual actions taken by JPMCB, was not commercially reasonable, and should be disallowed.

(e)     *JPMorgan Enjoys Record Profits in Lehman's Wake*

130.     Far from suffering losses, JPMorgan's CDS trading operations prospered in the immediate wake of Lehman's bankruptcy. Jeremy Barnum testified that JPMorgan profited substantially from its North American CDS trading during the week of September 15, 2008:

> Q. Okay. And so if I understand, what you're writing here is based on the information that you had as of the time you sent this e-mail, that the credit – North American credit trading group made $243 million in profit the week that Lehman filed for Chapter 11?

A. Yes. On an estimated basis and subject to all of the other caveats in here. But that's certainly what this e-mail is saying, yes.

Q. Was that a record week for the existence of the group?

A. I don't know for sure, but I think it's a reasonable assumption.[18]

131.    This record profit demonstrates that JPMorgan did not incur substantial costs as a result of Lehman's bankruptcy and that the trading environment for CDS during that week was in fact a significant profit opportunity for JPMorgan.  This is direct evidence of the commercially unreasonable nature of JPMorgan's CDS claims.

**E.    JPMorgan Did Not Use Commercially Reasonable Procedures to Close Out its Rates Portfolio with Lehman**

132.    JPMorgan also inflated its claims by more than $756 million by engaging in a number of grossly unreasonable practices in closing out its portfolio of interest rate derivatives.  LBSF had a large portfolio of 18,706 interest rate derivative trades with JPMorgan at the time of LBHI's bankruptcy.  Lehman has used readily available market data to determine that the mid-market close-out value of this portfolio should have been $34,817,642 in favor of JPMorgan.  Yet JPMorgan valued these trades at $791,633,656 in its own favor, as illustrated in the table below.

| Close-out Amount Calculations for Interest Rate Trades [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Master Agreement | No. Trades | JPMorgan Calculation of Close-out Amount/ Loss ($) | Market-Based Calculation of Close-out Amount/ Loss ($) | Difference ($) |
| LBSF-JPMCB | 15,915 | (1,749,148,091) | (1,129,888,937) | 619,259,154 |
| LBSF-JPMBD | 2,787 | 958,102,558 | 1,095,382,844 | 137,280,287 |
| LBSF-JPMM | 4 | (588,122) | (311,549) | 276,573 |
| **TOTAL** | 18,706 | (791,633,656) | (34,817,642) | 756,816,014 |

----

[18]    Barnum Tr., July 8, 2011, at  385:10-24.

133.    An examination of the transaction types with the largest differences between JPMorgan's valuation and Lehman's valuation reveals several trade types with sizeable differences.  Specifically, as the table below shows, a large proportion of JPMorgan's massive claim inflation arose in generic interest rate swaps, which account for $499.3 million, or nearly two-thirds of the total inflation.

| Close-out Amount/Loss Calculations for Interest Rate Trades by Trade [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Trade Category | No. Trades | JPMorgan Calculation of Close-out Amount/Loss | Market-Based Calculation of Close-out Amount/Loss | Difference |
| SWAP - GENERIC | 14,862 | (1,046,930,785) | (547,598,115) | 499,332,670 |
| OTHER | 202 | (185,857,525) | (188,808,770) | (2,951,245) |
| SWAP - XCCY | 266 | 135,987,899 | 204,764,603 | 68,776,704 |
| INFLATION - SWAP/CAP | 208 | (36,556,114) | 774,993 | 37,331,107 |
| EXOTIC | 77 | (19,678,932) | 6,127,431 | 25,806,363 |
| CAP/FLOOR - GENERIC | 129 | 169,633,469 | 250,876,359 | 81,242,890 |
| SWAP - AVG/BASIS | 484 | 54,598,786 | 65,867,803 | 11,269,018 |
| CAP/FLOOR - CMS/CMT | 63 | 9,246,948 | 34,062,624 | 24,815,676 |
| SWAPTION/CALLABLE SWAP | 2,159 | 111,864,706 | 121,973,831 | 10,109,125 |
| FRA - GENERIC | 256 | 16,057,892 | 17,141,598 | 1,083,706 |
| **TOTAL** | 18,706 | (791,633,656) | (34,817,642) | 756,816,014 |

134.    Generic interest rate swaps are one of the most common and liquid types of derivatives.  Valuation differences for this category of transactions should therefore be extremely small.  That JPMorgan's valuations would disagree with Lehman's market-based calculations by nearly $500 million can only be explained by the commercially unreasonable procedures employed by JPMorgan.

135.    The most common type of generic swap is a plain vanilla fixed rate versus floating rate swap denominated in US Dollars, where the floating rate is indexed to the three month LIBOR ("USD Generic Swap").  This was also the most common type of generic swap in JPMorgan's rates portfolio with LBSF, totaling 5,840 trades or nearly 40% of all rates trades.  As

the table below illustrates, the USD Generic Swap portfolio consisted of trades under two Master Agreements.  The valuation difference for USD Generic Swaps alone is nearly $162 million, the single largest difference for any trade type in the rates portfolio.

| Close-out Amount/Loss Calculations for USD Generic Swaps [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Master Agreement | No. Trades | JPMorgan Calc. of Close-out Amount/Loss | Market-Based Calc. of Close-out Amount/Loss | Difference |
| LBSF-JPMBD | 1,187 | 656,363,688 | 690,688,048 | 34,324,360 |
| LBSF-JPMCB | 4,653 | (1,047,210,835) | (919,618,597) | 127,592,238 |
| **TOTAL** | 5,840 | (390,847,147) | (228,930,549) | 161,916,598 |

An examination of USD Generic Swaps demonstrates the extraordinary actions JPMorgan took to wrongly inflate its claims for rates trades by more than three-quarters of a billion dollars.

136.    In many instances the Close-out Amounts and Loss amounts submitted by JPMorgan for rates trades are wildly inconsistent with both Lehman's market-based calculations and the values of other similar trades submitted by JPMorgan.  This inconsistency, combined with a lack of transparency in JPMorgan's supporting documentation, makes it difficult to provide a complete and succinct explanation of how JPMorgan closed out its rates portfolio.  However, it is clear that JPMorgan engaged in three broad types of commercially unreasonable conduct to inflate its rates claims.  First, JPMorgan valued rates trades as of dates other than the designated Early Termination Date, despite the fact that commercially reasonable determinants of value existed on that date.  Second, JPMorgan valued similar rates trades in an inconsistent and self-serving manner.  In addition to embedding Hypothetical Charges and otherwise artificially inflating the value of its claims, JPMorgan's use of inconsistent close-out procedures for rates trades had the effect (perhaps intentionally) of making it much more difficult to understand and reconstruct these claims.  The lack of supporting information provided by JPMorgan makes it impossible to determine how much of its claim inflation was a result of

incorrect pricing and how much was due to the inclusion of Hypothetical Charges. Third, JPMorgan did not apply commercially reasonable portfolio aggregation to its rates portfolio. Through these methods, JPMorgan was able to inflate its rates claims by more than $756 million.

> (a)  *JPMorgan Valued Rates Trades on Dates Other than the Early Termination Date Despite the Fact that Commercially Reasonable Determinants of Value Existed on that Date*

137. JPMorgan significantly inflated its rates claims through an opportunistic selection of close-out dates and times. Specifically, it appears that JPMorgan valued a large subset of its USD Generic Swaps as of September 19, 2008, despite having designated September 15 as the Early Termination Date. Furthermore, these trades appear to have been priced as of particular times that were especially favorable to JPMorgan.

138. The most significant market risk for generic interest rates swaps is the general level of interest rates. During the week of September 15, 2008, interest rate levels moved considerably. Rates generally moved lower throughout the day on September 15, but moved higher by Friday, September 19 and ended that day at levels broadly similar to those from a week earlier.

139. The increase in interest rate levels from September 15th to September 19th caused the value of trades where LBSF was a net receiver of the fixed rate to move significantly against LBSF. It appears that JPMorgan specifically closed out this group of trades on Friday September 19th, even though it had designated September 15 as the Early Termination Date under all of the relevant Master Agreements. JPMorgan's unnecessary and advantageous delay in valuing this part of its rates portfolio contradicted its own risk management practices and violated both the Master Agreements and the Bankruptcy Code.

140.    Commercially reasonable determinants very clearly existed to value these generic interest rate swaps as of September 15.  The interest rate swap market is very large and liquid.  The market has excellent price transparency through a variety of screen-based services such as Bloomberg.  Even with increased volatility, the interest rate swap market was very active and liquid on September 15, 2008.

141.    The fact that commercially reasonable determinants of value were abundantly available on September 15th is evidenced by:  (1) the fact that Lehman was able to value all of its rates trades with JPMorgan as of September 15th using readily available market data; and (2) the behavior of Lehman's other big bank counterparties, nearly all of which determined the close-out value of their rates books predominantly as of September 15, as illustrated in the following chart.[19]

| Counterparty | Rates Trade Count | Predominant Rates Valuation Date |
|---|---|---|
| A | 8,094 | 9/15/08 |
| B | 11,228 | 9/15/08 |
| C | 3,662 | 9/15/08 |
| D | 7,930 | 9/15/08 |
| E | 5,424 | Not Certain |
| F | 12,788 | 9/15/08 |
| G | 10,487 | 9/15/08 |
| H | 9,208 | 9/15/08 |
| I | 7,970 | 9/15/08 |
| J | 11,549 | 9/15/08 |
| K | 2,240 | 9/15/08 |
| L | 4,324 | 9/15/08 |

142.    Based on the limited supporting documentation that JPMorgan has made available to Lehman, it appears that JPMorgan performed valuations of its rates portfolio at

_____

[19]   For confidentiality purposes, Lehman's other big bank counterparties are identified herein only by letters.

various times over the course of the week of September 15, valuing many trades as of the close of business on September 19. Thus, even without access to complete information, it is clear that JPMorgan alone among Lehman's big bank counterparties delayed a portion of its rates close-out all the way to September 19, and opportunistically valued a subset of its trades as of a time when the market was particularly favorable to its positions. This delay improperly inflated JPMorgan's claims against LBSF, in violation of the Master Agreements and the Bankruptcy Code.

(b)     *JPMorgan Valued Rates Trades in an Inconsistent and Self-Serving Manner*

143.    JPMorgan valued interest rate swaps, particularly USD Generic Swaps, in an inconsistent and self-serving manner, and obfuscated its claims. This is in stark contrast to the values submitted by many of the Lehman Subsidiaries' other big bank counterparties, whose close-out methodologies for rates trades were generally easily understood and consistent.

144.    As a general matter, dealers determine prices for interest rate swaps by constructing yield curves, based on LIBOR rates, onto which they map their trades. Any differences in valuations of the same trades by different dealers should be relatively small, because their curves are created from models that generally use the same data and employ the same analytics. Slight variations are typically seen if two dealers weigh components of the models somewhat differently. However, these weightings normally stay in line with those of other dealers, since traders are obviously sensitive to any modeling issues that could put them at a competitive disadvantage.

145.    A comparison of JPMorgan's close-out values for USD Generic Swaps with those of other big bank counterparties illustrates that JPMorgan did not price these trades according to a consistent and commercially reasonable methodology. Even in cases where other counterparties submitted valuations that are inflated and do not match Lehman's market-based

calculations, the valuations largely track the shape of identifiable and comparable pricing curves. By contrast, many of JPMorgan's valuations are seemingly arbitrary and cannot be reconciled with the abundant market data available from the week of September 15. Price transparency in the USD Generic Swaps market is so great that when dealers disagree on trade valuations, the difference is typically a fraction of a single basis point. Accordingly, most of the other big banks priced close-out each rates trade within a few basis points or less from Lehman's internal marks. By contrast, JPMorgan's prices often differed from Lehman's marks by dozens, or even in excess of one hundred, basis points.

146. The following graphs illustrate differences between the close-out valuations for USD Generic Swaps calculated by Lehman and those calculated by particular big bank counterparties.[20] Each graph depicts the difference in these valuations for each USD Generic Swap between a Lehman Subsidiary and a particular counterparty at the time that counterparty closed out its derivatives trades with Lehman. Blue points represent trades in which the Lehman Subsidiary received the fixed rate, while red points represent those in which the Lehman Subsidiary paid the fixed rate. The swaps are organized by maturity date along the x-axis, while the y-axis shows the difference in basis points between the value of the trade as calculated by Lehman and the value as calculated by the counterparty.[21]

---

[20] Similar charts for all of the Lehman Subsidiaries' big bank counterparties are attached hereto as Exhibit G.

[21] Therefore if the counterparty valued all of the swaps identically to Lehman, the data points would form a horizontal line at the 0.0 mark of the y-axis.

**Example 1**  Counterparty 1, approximately 3,000 USD Generic Swaps.



**Example 2**  Counterparty 2, approximately 1,700 USD Generic Swaps.



147.    The above graphs reveal two conclusions about the close-out valuations performed by counterparties 1 and 2.  First, in each case the counterparty largely assigned similar prices to similar swaps.  This is evidenced by the fact that a majority of the points on each graph are clustered into a clearly identifiable line, and shows that the counterparties priced their interest rate swaps at close-out according to a standard curve.  Although there are some outlier trades on each graph, they are very few in number.  Second, the values assigned by each counterparty are generally close to those calculated by Lehman.  For a majority of the trades, the difference between Lehman's price and the counterparty's price was less than two basis points.  In both examples, even the outlier trades were priced within four basis points of Lehman's marks.  In sum, the differences in pricing are largely consistent.  As explained above, each counterparty constructs its own curve and some slight differences may be expected.  Specifically, slightly different valuations can be expected around a particular maturity date if one party used that maturity date in building its curve while the other party's curve interpolated to that point.  This difference appears in both of the above graphs as peaks in the line of data-points.  Because the differences in pricing largely manifest as peaks in an identifiable line, rather than a random scattering of points, they can be attributed to differences in curve construction.

148.    The close-out calculation for USD Generic Swaps by another counterparty shows a different pattern of divergence from Lehman's valuations, as illustrated in the following graph.



Example 3  Counterparty 3, approximately 3,800 USD Generic Swaps.



149.    In this graph, a majority of the points are again shaped into clearly identifiable lines.  Unlike in examples 1 and 2, however, the valuations submitted by this counterparty exhibit approximately four basis points of separation between the trades in which a Lehman Subsidiary received the fixed rate and those in which it paid the fixed rate.  This illustrates that the counterparty impermissibly charged add-ons of approximately two basis points on a trade-level basis when closing out these swaps.  By shifting each line two basis points to remove these add-ons, the valuations of this counterparty can be compared directly with those of Lehman, as in the following chart.

Example 4  Counterparty 3, corrected for 2 bp add-on.



150.     After eliminating the impermissible add-ons, the valuations by counterparty 3 also track closely to an identifiable line, illustrating that this counterparty employed standard yield curves to price its trades.  Moreover, despite some variation from Lehman's valuations, the vast majority of trades are again priced no more than two basis points from Lehman's marks, with the outliers all falling within four basis points.  Counterparties 1, 2, and 3 thus generally closed out their interest rate swaps with the Lehman Subsidiaries by pricing trades according to clearly identifiable yield curves.

151.     In contrast, similar graphs showing JPMorgan's close-out valuations for USD Generic Swaps exhibit none of the same characteristics as do those for big bank counterparties 1, 2, and 3.  The following graph illustrates the difference between Lehman's valuations of all the USD Generic Swaps under the LBSF-JPMCB Agreement and JPMCB's

valuations of those trades, using a scale of plus-or-minus 100 basis points. Note that the widest

scale on the four graphs above is plus-or-minus six (6) basis points.

<u>Example 5</u>  LBSF-JPMCB, 4,653 USD Generic Swaps.



152.    JPMCB's USD Generic Swap valuations do not exhibit any consistency

with those calculated by Lehman. Instead of forming a clear line, the valuation differences are

scattered across the chart, illustrating that JPMCB did not price its swaps using an identifiable

curve. Indeed, it is impossible to determine how JPMCB arrived at these close-out valuations.

In many cases, the same or very similar trades are valued dozens or even more than one hundred

basis points apart.

153.    Nothing in the nature or terms of these transactions warrants such a result.

The trades charted above are plain vanilla USD Generic Swaps, no different in any significant

way than those of Lehman's three other big bank counterparties illustrated in examples 1 through

4.  Yet the scale of JPMCB's valuation differences dwarfs that of Lehman's other big bank counterparties.  This is evidenced even more starkly when the same data for the USD Generic Swaps under the LBSF-JPMCB Agreement is viewed on scale of plus-or-minus 200 basis points.

<u>Example 6</u>  LBSF-JPMCB, 4,653 USD Generic Swaps.



154.    This scale reveals many transactions that JPMCB inexplicably priced more than 100 basis points away from Lehman's valuation made using market data from the close of business on September 15.  In fact, USD Generic Swap prices did not actually reach the levels marked by JPMCB until late November or December 2008, depending on maturity.  Yet JPMCB has assigned such prices to hundreds of trades.  Such obvious errors in the close-out calculations for easily priced, plain vanilla transactions cast serious doubt on the veracity of JPMorgan's claims.

155.    As noted above, after removing the add-ons wrongfully charged by counterparty 3, the examples above illustrate that big bank counterparties 1, 2, and 3 all priced a

vast majority of their USD Swaps within two basis points of Lehman's valuations, with even the outliers falling within four basis points. In contrast, the above graphs show that JPMCB's prices for USD Generic Swaps under the LBSF-JPMCB Agreement consistently differ from Lehman's by dozens of basis points, with the worst outliers priced approximately 200 basis points away from Lehman's market-based prices.

156. The degree of difference between the USD Generic Swap valuations submitted by JPMCB and those submitted by big bank counterparties 1,2, and 3, is clearly shown when the graphs from above are compared on the same scale.



157. JPMorgan's unreasonable pricing practices were not limited to swaps under the LBSF-JPMCB Agreement. An analysis of the close-out valuations assigned by JPMBD to USD Generic Swaps under the LBSF-JPMBD Agreement reveals a similar pattern.

Example 7  LBSF-JPMBD USD, 1,187 USD Generic Swaps



158.    JPMBD's valuations of USD Swaps under the LBSF-JPMBD Agreement likewise do not exhibit any consistency with those calculated by Lehman.  Specifically, JPMBD valued a large number of these swaps 30 to 60 basis points higher than did Lehman, with a number of other trades valued at more than 60 basis points above Lehman's marks. Additionally, as JPMCB did with swaps under the LBSF-JPMCB Agreement, JPMBD assigned enormously inconsistent prices to the same or similar trades.  This is illustrated in the above graph by the many vertically-aligned points, which in each case show JPMBD assigned a wide range of values to plain vanilla USD Generic Swaps with identical or substantially similar maturity dates.

159.    Not only are JPMorgan's valuations inconsistent within the LBSF-JPMCB and LBSF-JPMBD portfolios, but the valuations are inconsistent across these portfolios as well. The net USD Generic Swap positions under these two Master Agreements were in opposite

directions, with LBSF the net payer of the fixed rate under the LBSF-JPMCB Agreement and the net receiver of the fixed rate under the LBSF-JPMBD Agreement.  As a result, LBSF's positions in the two portfolios broadly offset one another.  Indeed, the below table shows that the LBSF-JPMBD portfolio moved in LBSF's favor by over $139 million (from positive $551 million to positive $690 million) from September 12, 2008 to September 15, 2008 while the LBSF-JPMCB portfolio moved against LBSF by over $233 million (from negative $686 million to negative $919 million) over the same time period.

| Comparison of Value of USD Generic Swaps in LBSF-JPMCB and LBSF-JPMBD Agreements [values in USD to LBSF] | | | | | |
|---|---|---|---|---|---|
| Master Agreement | No. Trades | Portfolio Value on September 12, 2008 | Market-Based Calculation of Close-out Amount/Loss on September, 15, 2008 | JPMorgan Close-out Amount/Loss | Difference |
| LBSF-JPMCB | 4,653 | (686,138,746) | (919,618,597) | (1,047,210,835) | 127,592,238 |
| LBSF-JPMBD | 1,187 | 551,544,317 | 690,688,048 | 656,363,688 | 34,324,360 |
| **Total** | 5,840 | (134,594,429) | (228,930,549) | (390,847,147) | 161,916,598 |

160.     To derive these valuations, Lehman applied the same market-based yield curve to the USD Generic Swaps under each Master Agreement.  In comparison to Lehman's prices, those used by JPMorgan to value the trades under the LBSF-JPMCB Agreement were more favorable to JPMorgan, as the net receiver of the fixed rate.  However, the prices used by JPMorgan to value the trades under the LBSF-JPMBD Agreement were skewed in the exact opposite direction, as they were more favorable to JPMorgan, the net payer of the fixed rate.  In other words, JPMorgan priced swaps under the LBSF-JPMCB Agreement based on lower projected interest rates, which benefited JPMorgan's position as receiver of the fixed rate, but priced the same swaps under the LBSF-JPMBD Agreement based on higher projected interest rates, which benefited its position as payer of the fixed rate.  There is no reason for JPMorgan to

have priced plain vanilla USD Generic Swaps using different prices for the same transactions under the two Master Agreements, other than to intentionally inflate its claims.

161. Under both the LBSF-JPMCB Agreement and the LBSF-JPMBD Agreement, there is no commercially reasonable explanation for the vast discrepancies between JPMorgan's close-out valuations and those calculated by Lehman using readily available market data. The above analysis of these discrepancies shows that JPMCB and JPMBD did not price their USD Generic Swap portfolios according to any type of industry standard curve, and instead employed arbitrary and inconsistent procedures. These examples for USD Generic Swaps, the most common type of rates transactions, are typical of JPMorgan's haphazard and even irrational close-out of their entire rates portfolios with LBSF, which resulted in an aggregate claim inflation of $756.8 million. By not using a consistent pricing curve, JPMorgan failed to use commercially reasonable procedures to recognize the loss mitigation inherent in offsetting positions. This result is not commercially reasonable, and violates the close-out provisions of the Master Agreements and New York law.

(c)     *JPMorgan Did Not Apply Commercially Reasonable Portfolio Aggregation When Closing Out its Rates Portfolio*

162. In addition to its use of inconsistent prices, JPMorgan also failed to apply commercially reasonable portfolio aggregation when closing out interest rate derivative trades. This denied LBSF the benefit of significant portfolio effects and contributed to the massive inflation of JPMorgan's rates claims. JPMorgan's lack of portfolio aggregation can be clearly seen in Examples 5, 6, and 7 above. As evidenced in these graphs, JPMorgan assigned wildly different values to plain vanilla USD Generic Swaps with identical or highly similar maturities, instead of aggregating such trades.

163.     JPMorgan's lack of portfolio aggregation directly contradicts the Close-out Amount definition in the COA Master Agreements, which required JPMorgan to determine the economic equivalent of the material terms of its portfolios under each of the COA Master Agreements.  In addition, JPMorgan was required to take into account the loss mitigating effect of portfolio aggregation as required by the Master Agreements and New York law.  JPMorgan failed to meet these obligations when closing out its rates portfolio, which improperly inflated its claims.

**F.     JPMorgan Did Not Use Commercially Reasonable Procedures to Close Out its FX Portfolio with Lehman**

164.     JPMorgan also closed out its foreign exchange ("FX") trades with the Lehman Subsidiaries in a commercially unreasonable manner, resulting in a nearly $117 million inflation in JPMorgan's claims. The FX market is one of the largest, most liquid, and most transparent markets for any type of over-the-counter derivative.  Most of the FX trades entered into by Lehman and JPMorgan were simply exchanges of one currency for another (or the option to enter into such an exchange) at a specific date.  Pricing information for foreign exchange transactions is widely published and easily available from sources such as Bloomberg and Reuters.

165.     Despite the transparency of the FX market, JPMorgan submitted claims for FX trades in an amount nearly $118 million greater than the values calculated by Lehman from readily available market data, as illustrated in the table below.

| Close-out Amount Calculations for FX Portfolio [values in USD to Lehman] | | | | |
|---|---|---|---|---|
| Master Agmt. | No. Trades | JPMorgan Calculation of Close-out Amount/Loss | Market-Based Calculation of Close-out Amount/Loss | Difference |
| LBCC-JPMCB | 2,493 | (206,751,330) | (109,362,752) | 97,388,578 |
| LBCC-BSFX | 106 | (14,789,906) | (7,461,560) | 7,328,346 |
| LBSF-JPMCB | 10 | 1,746,246 | 15,079,887 | 13,333,640 |
| LBSF-JPMBD | 5 | 2,834,702 | 2,550,736 | (283,967) |
| **TOTAL** | 2,614 | (216,960,287) | (99,193,690) | 117,766,598 |

166.     Out of a total of 2,614 FX trades, the two largest types of transactions were FX forward and FX option trades.  As the table below shows, these are also the source of the greatest valuation differences.

| FX Valuation Differences by Trade Category [values in USD to Lehman] | | | | | |
|---|---|---|---|---|---|
| Master Agreement | Category | No. Trades | JPMorgan Calculation of Close-out Amount/Loss | Market-Based Calculation of Close-out Amount/Loss | Difference |
| LBCC-JPMCB | Forward | 1,251 | (77,178,434) | (28,533,460) | 48,644,974 |
| | Option | 1,220 | (136,654,193) | (87,546,469) | 49,107,724 |
| | Other | 22 | 7,081,297 | 6,717,177 | (364,120) |
| | Total | 2,493 | (206,751,330) | (109,362,752) | 97,388,578 |
| LBCC-BSFX | Option | 64 | (302,969) | 743,577 | 1,046,546 |
| | Forward | 42 | (14,486,937) | (8,205,137) | 6,281,800 |
| | Total | 106 | (14,789,906) | (7,461,560) | 7,328,346 |
| LBSF-JPMCB | Option | 6 | 16,644,541 | 16,754,598 | 110,056 |
| | Other | 4 | (14,898,295) | (1,674,711) | 13,223,584 |
| | Total | 10 | 1,746,246 | 15,079,887 | 13,333,640 |
| LBSF-JPMBD | Option | 3 | 2,834,702 | 2,136,090 | (698,612) |
| | Forward | 2 | 0 | 414,645 | 414,645 |
| | Total | 5 | 2,834,702 | 2,550,736 | (283,967) |

JPMorgan has submitted incomplete information regarding the close out of its portfolio of FX trades, despite requests for information from Lehman.  This lack of transparency has made it difficult to determine the exact actions that led to JPMorgan's claim inflation.  However, certain commercially unreasonable actions are clear.  First, JPMorgan closed out FX trades using price

levels that did not exist on September 15, the designated Early Termination Date for these trades. Second, JPMorgan shifted its FX pricing curves in a self-serving, favorable manner depending on its net position for the particular group of trades. Third, JPMorgan embedded exaggerated hypothetical bid/offer charges that it did not incur into its close-out valuations for FX, and exaggerated their effect by failing to apply commercially reasonable portfolio aggregation.

167.     As with the other derivatives products, it appears JPMorgan closed out its FX trades with the Lehman Subsidiaries as of a date other than the Early Termination Date of September 15, as JPMorgan designated under the relevant Master Agreements. Specifically, although JPMorgan claimed to have closed out its FX portfolio as of September 15, many trades were closed out at values far outside those observable in the market on that date. By way of example, Lehman and JPMorgan had entered into 27 AUD/USD FX forwards that were scheduled to mature on September 17, 2008. Because the Early Termination Date for these trades was September 15, 2008, their value can be easily determined by reference to the AUD/USD spot rate on that date.[22] JPMorgan valued 23 of these 27 trades consistently, but at a price that did not exist on September 15, 2008. The remaining four trades were inconsistently priced and were part of a different trading book.

168.     The chart below shows JPMorgan's implied spot rate for the 23 consistently priced trades compared to the spot rates that were observed in the market during the week of September 15, 2008. As can be seen, the spot rate used by JPMorgan did not occur on September 15. In fact, this rate was not observed in the market until Wednesday, September 17.

---

[22]   The "spot date" for FX transactions is two days after execution. Hence, AUD/USD FX spot trades executed on September 15, 2008 would have settled on September 17, 2008. The AUD/USD spot rate was readily observable and deeply liquid on September 15, 2008.



Thus, JPMorgan appears to have used an AUD/USD rate that was lower than any that actually occurred in the market on September 15, which inflated its claim by several million dollars.

169.     In addition to these 27 AUD/USD forward trades, JPMorgan also had a portfolio of AUS/USD options.  These options had a net exposure to the movement of the AUD/USD exchange rate that faced the opposite direction from the exposure of the group of 27 forwards described above.  In contrast to the forward trades, JPMorgan priced the option trades according to an implied spot rate that was ***higher*** than any rate that actually occurred in the market on September 15.

170.     Thus, JPMorgan had two sets of AUD/USD related FX trades with opposite exposure to the movement of the AUD/USD exchange rate and it priced each set of trades at materially different AUD/USD FX rates, that were respectively higher and lower than

any rate observed in the market on the Early Termination Date.  This action is  indicative of JPMorgan's claims across the FX portfolio, which were inflated by tens of millions of dollars in this manner.

171.     It appears that JPMorgan achieved much of its FX claim inflation by embedding exaggerated hypothetical bid/offer charges in its close-out values for FX trades. These charges are not reflective of any market reality, as the FX market is tremendously liquid and was functioning with extremely narrow bid/offer spreads on September 15, 2008.  JPMorgan further exaggerated the amount of these Hypothetical Charges by failing to apply commercially reasonable portfolio aggregation to its FX trades.  Taken together, these impermissible procedures violated the Master Agreements, New York law, and the Bankruptcy Code, and inflated JPMorgan's FX claims by almost $125 million.

**G.     JPMorgan Did Not Use Commercially Reasonable Procedures to Close Out its Securitized Products Portfolio with Lehman**

172.     LBSF and JPMorgan also had a portfolio of securitized products trades, which are CDS written on products such as mortgage backed securities or collateralized debt obligations.  The parties entered into 1,061 such CDS under the LBSF-JPMCB and LBSF-JPMM Agreements, with LBSF as the net seller of protection.  As illustrated in the table below, JPMorgan submitted claims for these securitized products trades in an amount nearly $143 million above the values calculated by LBSF using available market data, with most of this overstatement arising from JPMCB's valuation of trades under the LBSF-JPMCB Agreement.

| Close-out Amount/Loss Calculations for Securitized Products [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Master Agreement | No. Trades | JPMorgan Close-out Amount/Loss ($) | LBSF Market-Based Calculation of Close-out Amount/Loss ($) | Difference ($) |
| LBSF-JPMCB | 1,061 | (213,311,415) | (72,489,912) | 140,821,503 |
| LBSF-JPMM | 1 | (1,059,777) | 1,010,246 | 2,070,022 |
| **TOTAL** | 1,062 | (214,371,192) | (71,479,666) | 142,891,526 |

JPMorgan achieved this claim inflation of nearly $143 million primarily by failing to apply commercially reasonable portfolio aggregation and by embedding excessively large bid/offer charges in its calculations of Loss and Close-out Amounts.

173. For securitized products trades under the LBSF-JPMCB Agreement, JPMCB employed an excessively narrow method of portfolio aggregation that is inconsistent with industry practice and the requirements of the Master Agreements and New York law. First, JPMCB did not apply any portfolio aggregation across trading desks. This resulted in inconsistent prices – that were nearly always favorable to JPMCB – for exactly offsetting positions. Second, within each trading desk, JPMCB appears to have only aggregated index trades that were *identical* in every detail other than notional value and direction (i.e. which party sold the protection). Based on the limited data provided by JPMCB, it appears that JPMCB did not apply any portfolio aggregation at all to single name trades. In all cases, JPMCB embedded excessive hypothetical bid/offer charges in the value of each trade. This failure to take into account the loss mitigating effect of portfolio aggregation meant that JPMCB provided LBSF with the benefit of only a tiny fraction of the real portfolio effect, which was massive for this portfolio of securitized products trades.

174. CDS related to securitized products are less liquid than more standardized derivatives and consequently are often associated with wider bid/offer charges. However, these

securitized products trades typically change value in a highly correlated fashion. The result is that these trades are managed on a portfolio basis for risk management purposes, with attention given to individual trades only when they possess a unique risk.

175. A majority of the trades in the securitized products portfolio between JPMCB and LBSF carried similar types of risk. Specifically, these were trades in which JPMCB purchased or sold protection on subprime or Alt-A residential mortgage backed securities ("RMBS"). The table below shows the Close-out Amounts for the 725 securitized products trades under the LBSF-JPMCB Agreement that were CDS on RMBS. The valuation difference on this group of trades is over $90 million.

| Close-out Amount Calculations for CDS on RMBS under LBSF-JPMCB Agreement [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Product Type | No. Trades | JPMorgan Close-out Amount ($) | LBSF Market-Based Calculation of Close-out Amount ($) | Difference ($) |
| INDEX RMBS | 210 | 52,574,243 | 88,757,834 | 36,183,590 |
| SINGLE NAME CDS ON EUROPEAN RMBS | 9 | (15,321,562) | (13,662,080) | 1,659,482 |
| SINGLE NAME CDS ON FIXED RATE RMBS | 13 | (39,739,808) | (37,080,616) | 2,659,192 |
| SINGLE NAME CDS ON U.S. RMBS | 493 | (197,554,277) | (147,570,875) | 49,983,401 |
| **TOTAL** | 725 | (200,041,404) | (109,555,738) | 90,485,666 |

176. Lehman reviewed the 493 CDS on U.S. RMBS under the LBSF-JPMCB Agreement and identified 458 of the trades that had been in existence since at least March 31, 2008 – over five months prior to the LBHI bankruptcy. These 458 trades consisted of 252 trades in which LBSF purchased protection and 206 trades in which LBSF sold protection. The graph below shows the average value (as a percent of notional amount) for these "buys" of protection and for these "sells" of protection. As can be seen, the sells had a slightly higher average value than the buys. However, since both buys and sells were based on pools of mortgages that had

similar economic characteristics, the overall price movement between the buys and sells was highly correlated.  Nearly every day that the buys increased in value so did the sells, and vice versa.[23]



177.    The above graph clearly illustrates the significance of the portfolio effect on this portion of the securitized products portfolio between LBSF and JPMCB.  The 252 buys of protection substantially offset the risk and price movement in the 206 sells of protection.  It would make no sense to individually replace each securitized products trade and incur a substantial bid/offer charge on every one when the net portfolio had significantly less risk.  Yet this is broadly what JPMCB did when constructing its claim.

178.    Instead of engaging in a good faith attempt to value these positions, JPMCB instead chose a close-out method that was designed to maximize its claim.  By predominantly valuing its trades individually with excessive embedded bid/offer charges,

---

[23]    In fact, the only anomalous points on the graph are related to the timing of cash payments.

JPMCB created a large hypothetical loss, enabling it to grossly inflate its claims. JPMCB never attempted to meet its good faith obligation to use commercially reasonable procedures and mitigate damages by recognizing the significant portfolio aggregation effect described above. Moreover, JPMCB's claims appear to be in direct contradiction to the actions it actually took. Specifically, JPMCB has not identified any individual replacement trades for this portfolio, further supporting that it managed its securitized products transactions on a portfolio basis.

179. By denying the Lehman Subsidiaries the benefit of any portfolio effects and embedding excessive bid/offer charges in their valuations, JPMorgan inflated its claims far beyond the economic equivalent of the material terms of their securitized products positions. As a result, JPMorgan's claims resulting from the close-out of its securitized products portfolio should be reduced to the proper amounts as reflected in the values obtained by LBSF using readily available market data.

**H.**     **Triangular Setoff of Termination Payments by JPMorgan Violated the Bankruptcy Code**

180. The Schedules to the Master Agreements contain provisions that provide for the setoff of early termination payments from a Lehman Subsidiary across JPMorgan entities and from a JPMorgan entity across Lehman Subsidiaries (the "Triangular Netting Provisions"). On August 1, 2008, JPMCB entered into a cross affiliate agreement with the Lehman Subsidiaries (the "Cross Affiliate Agreement"), which provided for, among other things, setoff of JPMCB's payments across its Master Agreements with the Lehman Subsidiaries.

181. Under section 553 of the Bankruptcy Code, a creditor is able to "offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a).

182.     This Court has repeatedly referred to the axiomatic principle of bankruptcy law, codified in section 553, requiring mutuality in order to exercise a right to set off. Debts are considered "mutual" only when they are due to and from the same persons acting in the same capacity.

183.     As described below, the setoffs effectuated by JPMorgan pursuant to the Triangular Netting Provisions and the Cross Affiliate Agreement are invalid under the Bankruptcy Code due to a lack of mutuality.

I.     **Under a Proper Close-out of the Master Agreements, JPMorgan Owes the Lehman Subsidiaries More Than $339 Million and its Claims Should Be Reduced to $250 Million**

**LBSF-JPMCB Agreement**

184.     JPMCB claims that as of September 15, 2008 it had posted $254,503,233 of collateral to LBSF under the LBSF-JPMCB Agreement.[24]   By notice dated September 15, 2008, JPMCB terminated the transactions under that Master Agreement.  On October 17, 2008, JPMCB submitted a calculation statement to LBSF pursuant to section 6(d) of the LBSF-JPMCB Master Agreement.

185.     On September 22, 2009, JPMCB filed proof of claim number 27189 against LBSF (as amended, proof of claim number 66455) and proof of claim number 27198 against LBHI (as amended, proof of claim number 66462) for, among other things, amounts allegedly due to JPMCB under the LBSF-JPMCB Master Agreement (the "LBSF-JPMCB Claim").  According to JPMCB, the amount of the LBSF-JPMCB Claim was $2,197,547,158. Prior to the filing of the initial LBSF-JPMCB Claim, JPMCB paid itself in part in respect of this claim by applying a portion of the $8.6 billion of cash collateral it had siphoned from LBHI in

---

[24]  In its Amended and Restated Annex to Proofs of Claim, JPMCB asserts that $1,917,144 of interest accrued on this collateral.  LBSF calculations reflect that the collateral posted by JPMCB under this Agreement actually amounts to $247,396,154 including accrued interest.

the week before the Commencement Date.[25]  Specifically, JPMCB paid itself as follows:

        (a)    $409,990,252.13 was taken from LBSF bank accounts maintained at JPMCB;

        (b)    $95,630,552 was set off against amounts owed by JPMC & Co. to LBSF under the LBSF-JPMC & Co. Agreement pursuant to a Triangular Netting Provision (the "JPMC & Co. Setoff")[26];

        (c)    $34,642,742 was set off against amounts owed by JPMBD to LBSF under the LBSF-JPMBD Master Agreement pursuant to a Triangular Netting Provision (the "JPMBD Setoff");

        (d)    $3,042,523 was set off against amounts owed by BSCP to LBSF under the LBSF-BSCP Agreement pursuant to a Triangular Netting Provision (the "BSCP Setoff");

        (e)    $37,158,179 was paid through the setoff of amounts allegedly due and application of collateral posted by LBCS pursuant to the LBCS-JPMCB Agreement in connection with the Cross Affiliate Agreement (the "LBCS-JPMCB Setoff"); and

        (f)    $1,574,475,765.50 was paid by the application of collateral posted by LBHI independent of the Master Agreements and purportedly under the September Security Agreement and September Guaranty.

---

[25]  The application of LBHI cash to satisfy the claims that are the subject of this adversary proceeding is challenged as a violation of section 362 of the Bankruptcy Code in Counts XXXIII and XXXIV of the First Amended Complaint of LBHI and the Committee against JPMCB (Adv. Pro. No. (10-03266-JMP).

[26]  By notice dated September 15, 2008, JPMC & Co. terminated the transactions under the LBSF-JPMC & Co. Agreement.  As of September 15, 2008, there were no transactions outstanding under the LBSF-JPMC & Co. Agreement.  However, JPMC & Co. asserts in its in its Amended and Restated Annex to Proofs of Claim that it was holding $95,500,000 as posted collateral, and that $130,552 of interest accrued on this collateral. LBSF calculations reflect that the collateral held by JPMC & Co. under this Agreement actually amounts to $95,560,944 including accrued interest.

186. For the reasons set forth above, the LBSF-JPMCB Claim is overstated. Based upon LBSF's calculation, the LBSF-JPMCB Claim should be reduced to $191,073,637.

187. Moreover, each of the JPMC & Co. Setoff, the JPMBD Setoff, the BSCP Setoff, and the LBCS-JPMCB Setoff violated the Bankruptcy Code because they lacked the mutuality required by Section 553.

**LBSF-JPMBD Agreement**

188. JPMBD claims that as of September 15, 2008 it had posted $923,766,576 of collateral to LBSF under the LBSF-JPMBD Agreement.[27] By notice dated September 15, 2008, JPMBD terminated the transactions under that Master Agreement. On October 17, 2008, JPMBD submitted a calculation statement to LBSF pursuant to section 6(d) of the LBSF-JPMBD Master Agreement.

189. JPMBD acknowledged that it owed LBSF $958,409,318. JPMBD netted this amount against the collateral held by LBSF resulting in a net payable due to LBSF in the amount of $34,642,742. Instead of paying $34,642,742 to LBSF, JPMBD, via the JPMBD Setoff, applied the funds to satisfy the inflated claim that JPMCB filed against LBSF.

190. For the reasons set forth above, JPMBD understated the amount due to LBSF under the LBSF-JPMBD Agreement. Based upon LBSF's calculation, the close-out of the LBSF-JPMBD Agreement should result in a payment of $180,134,747 to LBSF in addition to the collateral held by LBSF.

191. Moreover, the JPMBD Setoff violated the Bankruptcy Code because it lacked the mutuality required by Section 553.

---

[27] In its Amended and Restated Annex to Proofs of Claim, JPMBD asserts that $1,527,258 of interest accrued on this collateral. LBSF calculations reflect that collateral posted by JPMBD under this Agreement actually amounts to $921,026,203 including accrued interest.

**LBSF-BSCP Agreement**

192.     BSCP claims that as of September 15, 2008, LBSF had posted $1,111,244 of collateral to BSCP under the LBSF-BSCP Agreement.[28]  By notice dated September 15, 2008, BSCP terminated the transactions under that Master Agreement.  On October 17, 2008, BSCP submitted a calculation statement to LBSF pursuant to section 6(d) of the LBSF-BSCP Master Agreement.

193.     BSCP acknowledged that it owed LBSF $3,042,523.  Instead of paying $3,042,523 to LBSF, BSCP, via the BSCP Setoff, applied the funds to satisfy the inflated claim that JPMCB filed against LBSF.

194.     The BSCP Setoff violated the Bankruptcy Code because it lacked the mutuality required by Section 553.

**LBSF-JPMM Agreement**

195.     JPMM claims that as of September 15, 2008, LBSF had posted $2,012,723 of collateral to JPMM under the LBSF-JPMM Agreement.[29]  By notice dated September 15, 2008, JPMM terminated the transactions under that Master Agreement.  On October 17, 2008, JPMM submitted a calculation statement to LBSF pursuant to section 6(d) of the LBSF-JPMM Master Agreement.

196.     On September 22, 2009, JPMM filed proof of claim number 27192 against LBSF (as amended, proof of claim number 66451) and proof of claim number 27204 against

---

[28]  In its Amended and Restated Annex to Proofs of Claim, BSCP asserts that $391,602 of interest accrued on this collateral.  LBSF calculations reflect that the collateral held by BSCP under this Agreement actually amounts to $1,397,124 including accrued interest.

[29]  In an Exposure Summary that was prepared by JPMM at the same time as its Amended and Restated Annex to Proofs of Claim, JPMM asserts that $147,831 of interest accrued on this collateral.  However, this information is not included in JPMM's Amended and Restated Annex to Proofs of Claim. LBSF calculations reflect that the collateral held by JPMM under this agreement actually amounts to $2,116,120 including accrued interest.

LBHI (as amended, proof of claim number 66474) for, among other things, amounts allegedly due to JPMM under the LBSF-JPMM Master Agreement (the "LBSF-JPMM Claim"). According to JPMM, the amount of the LBSF-JPMM Claim was $19,659,834. Prior to the filing of the initial LBSF-JPMM Claim, JPMM paid itself in part in respect of this claim by applying a portion of the $8.6 billion of cash collateral JPMCB had siphoned from LBHI in the week before the Commencement Date. Specifically, JPMM paid itself as follows:

      (a)     $2,012,723 was paid by application of collateral posted by LBSF under the LBSF-JPMM Agreement;

      (b)     $17,647,111 was paid by the application of collateral posted by LBHI independent of the Master Agreements and purportedly under the September Security Agreement and September Guaranty.

197. For the reasons set forth above, the LBSF-JPMM Claim is invalid. Based upon LBSF's calculation, the LBSF-JPMM Claim should be disallowed and expunged and the close-out of the LBSF-JPMM Agreement should result in a payment of $10,433,756 to LBSF.

**LBCS-JPMCB**

198. JPMCB claims that as of September 15, 2008, LBCS had posted $65,114,357 of collateral to JPMCB under the LBCS-JPMCB Agreement.[30] By notice dated September 15, 2008, JPMCB terminated the transactions under that Master Agreement. On October 17, 2008, JPMCB submitted a calculation statement to LBCS pursuant to section 6(d) of the LBCS-JPMCB Master Agreement.

199. On September 22, 2009, JPMCB filed proof of claim number 27184 against LBCS (as amended, proof of claim number 66473) and proof of claim number 27198

---

[30] In its Amended and Restated Annex to Proofs of Claim, JPMCB asserts that $90,271 of interest accrued on this collateral. LBCS calculations reflect that the collateral held by JPMCB under this Agreement actually amounts to $65,156,789 including accrued interest.

against LBHI (as amended, proof of claim number 66462) for, among other things, amounts allegedly due to JPMCB under the LBCS-JPMCB Master Agreement (the "LBCS-JPMCB Claim"). According to JPMCB, the amount of the original LBCS-JPMCB Claim was $74,972,443. Prior to the filing of the initial LBCS-JPMCB Claim, JPMCB paid itself in full in respect of this claim as follows:

(a)     $66,304,633 was paid through setoff of funds in an LBCS bank account maintained at JPMCB; and

(b)     $8,677,810 was paid by the application of collateral posted by LBCS under the LBCS-JPMCB Agreement.

200.    On April 1, 2010, JPMCB revised the LBCS-JPMCB Claim to $75,703,989. JPMCB did not indicate how it adjusted the setoff of funds to account for this decrease in the LBCS-JPMCB Claim.

201.    For the reasons set forth above, the LBCS-JPMCB Claim is overstated. Based upon LBCS's calculation, the LBCS-JPMCB Claim should be reduced to $864,992 after the application of collateral posted by LBCS under the LBCS-JPMCB Agreement.

**LBCS-JPMSL Agreement**

202.    JPMSL claims that as of September 15, 2008, LBCS had posted $18,015,000 of collateral to JPMSL under the LBCS-JPMSL Agreement.[31] By notice dated September 15, 2008, JPMSL terminated the transactions under that Master Agreement. On October 17, 2008, JPMSL submitted a calculation statement to LBCS pursuant to section 6(d) of the LBCS-JPMSL Master Agreement.

---

[31] In its Amended and Restated Annex to Proofs of Claim, JPMSL asserts that $24,877 of interest accrued on this collateral. LBCS calculations reflect that the collateral held by JPMSL under this Agreement actually amounts to $18,014,785 including accrued interest.

203.    On September 22, 2009, JPMSL filed proof of claim number 27186 against LBSF (as amended, proof of claim number 66543) and proof of claim number 27183 against LBHI (as amended, proof of claim number 66470) for, among other things, amounts allegedly due to JPMSL under the LBCS-JPMSL Agreement (the "LBCS-JPMSL Claim"). According to JPMSL, the amount of the amended LBCS-JPMSL Claim was $28,853,137.  Prior to the filing of the LBCS-JPMSL Claim, JPMSL paid itself in full in respect of this claim as follows:

(a)    $18,015,000 was paid through application of collateral posted by LBCS under the LBCS-JPMSL Agreement; and

(b)    $10,838,137 was paid through application of collateral posted by LBCS under the LBCS-JPMCB Agreement pursuant to a Triangular Netting Provision (the "JPMCB Setoff").

204.    For the reasons set forth above, the LBCS-JPMSL Claim is overstated. Based upon LBCS's calculation, the LBCS-JPMSL Claim should be reduced to $3,693,520, after the application of collateral posted by LBCS under the LBCS-JPMSL Agreement.

205.    Moreover, the JPMCB Setoff violated the Bankruptcy Code because it lacked the mutuality required by Section 553.

**LBCS-JPMVEC Agreement**

206.    JPMVEC claims that as of September 15, 2008 it had posted $45,692,995 of collateral to LBCS under the LBCS-JPMVEC Agreement.[32]  By notice dated September 15, 2008, JPMVEC terminated the transactions under that Master Agreement.  On October 17, 2008,

---

[32] In its Amended and Restated Annex to Proofs of Claim, JPMVEC asserts that $74,142 of interest accrued on this collateral. LBCS calculations reflect that the collateral posted by JPMVEC under this Agreement actually amounts to $45,838,767 including accrued interest.

JPMVEC submitted a calculation statement to LBCS pursuant to section 6(d) of the LBCS-JPMSL Master Agreement.

207.    On September 22, 2009, JPMVEC filed proof of claim number 27187 against LBCS (as amended, proof of claim number 66454) and proof of claim number 27201 against LBHI (as amended, proof of claim number 66472) for, among other things, amounts allegedly due to JPMVEC under the LBCS-JPMVEC Master Agreement (the "LBCS-JPMVEC Claim"). According to JPMVEC, the amount of the LBCS-JPMVEC Claim was $7,808,956. Prior to the filing of the initial LBCS-JPMVEC Claim, JPMVEC paid itself in full with respect to this claim by applying collateral posted by LBCS under the LBCS-JPMCB Agreement pursuant to a Triangular Netting Provision (the "JPMVEC Setoff").

208.    For the reasons set forth above, the LBCS-JPMVEC Claim is overstated. Based upon LBCS's calculation, the LBCS-JPMVEC Claim should be reduced to $1,708,731.

209.    Moreover, the JPMVEC Setoff violated the Bankruptcy Code because it lacked the mutuality required by Section 553.

### LBCC-JPMCB Agreement

210.    JPMCB claims that as of September 15, 2008 LBCC had posted $41,483,000 of collateral to JPMCB under the LBCC-JPMCB Agreement.[33] By notice dated September 15, 2008, JPMCB terminated the transactions under that Master Agreement. On October 17, 2008, JPMCB submitted a calculation statement to LBCC pursuant to section 6(d) of the LBCC-JPMCB Master Agreement.

211.    On September 22, 2009, JPMCB filed proof of claim number 27193 against LBCC (as amended, proof of claim number 66476) and proof of claim number 27198

---

[33] In its Amended and Restated Annex to Proofs of Claim, JPMCB asserts that $81,215 of interest accrued on this collateral. LBCC calculations reflect that the collateral held by JPMCB under this Agreement actually amounts to $41,909,442 including accrued interest.

against LBHI (as amended, proof of claim number 66462) for, among other things, amounts allegedly due to JPMCB under the LBCC-JPMCB Agreement (the "LBCC-JPMCB Claim"). According to JPMCB, the amount of the LBCC-JPMCB Claim was $215,213,717. Prior to the filing of the initial LBCC-JPMCB Claim, JPMCB paid itself in part in respect of this claim by applying a portion of the $8.6 billion of cash collateral it had siphoned from LBHI in the week before the Commencement Date. Specifically, JPMCB paid itself as follows:

(a)  $41,483,000 was paid through application of collateral posted by LBCC under the LBCC-JPMCB Agreement; and

(b)  $124,787,223 was paid through application of collateral posted by LBHI independent of the Master Agreements and purportedly under the September Security Agreement and September Guaranty; and

(c)  $48,943,494 was paid by setoff of amounts owing by BSFX to LBCC under the LBCC-BSFX Agreement pursuant to a Triangular Netting Provision (the "BSFX Setoff").

212.  For the reasons set forth above, the LBCC-JPMCB Claim is overstated. Based upon LBCC's calculation, the LBCC-JPMCB Claim should be reduced to $52,695,077 after the application of collateral posted by LBCC under the LBCC-JPMCB Agreement.

213.  Moreover, the BSFX Setoff violated the Bankruptcy Code because it lacked the mutuality required by Section 553.

**LBCC-BSFX**

214.  As of September 15, 2008, no collateral was posted under the LBCC-BSFX Agreement. By letter dated September 16, 2008, BSFX notified LBCC of its intention to

close out and liquidate all outstanding currency obligations and options. On October 17, 2008, BSFX submitted a calculation statement to LBCC.

215.    BSFX acknowledged that it owed LBCC $48,943,494. Instead of paying $48,943,494 to LBCC, BSFX, via the BSFX Setoff, applied the funds to satisfy the inflated claim that JPMCB filed against LBCC.

216.    For the reasons set forth above, BSFX understated the amount due to LBCC under the LBCC-BSFX Agreement. Based upon LBCC's calculation, the close-out of the LBCC-BSFX Agreement should result in a payment of $50,817,792 to LBCC.

217.    Moreover, the BSFX Setoff violated the Bankruptcy Code because it lacked the mutuality required by Section 553.

**J.      Conclusion**

218.    Taken collectively, the improper and commercially unreasonable procedures used by JPMorgan to close out the Master Agreements inflated its claims against the Lehman Subsidiaries by more than $2.325 billion. As detailed in the following table, a commercially reasonable calculation of the Close-out Amounts and the Loss amounts due under the Master Agreements (using Lehman's market-based valuations as of the close of business on September 15, 2008) results in JPMorgan owing the Lehman Subsidiaries more than $339 million under five of the Master Agreements, while JPMorgan has a claim of $250 million under the remaining Master Agreements.

| [value to Lehman Subsidiaries in USD] | Market-Based Close-out Amount/Loss | + | Collateral Posted* | + | Unpaid Amounts | = | Market-Based Calculation of Net Claim Amount | v. | JPMorgan Net Claim Amount |
|---|---|---|---|---|---|---|---|---|---|
| LBSF-JPMCB | 129,338,293 | | (247,396,154) | | (73,015,775) | | (191,073,637) | | (2,197,547,158) |
| LBSF-JPMC & Co. | 0 | | 95,560,944 | | 0 | | 95,560,944 | | 95,630,552 |
| LBSF-JPMBD | 1,098,943,826 | | (921,026,203) | | 2,217,124 | | 180,134,747 | | 34,642,742 |
| LBSF-BSCP | 1,279,465 | | 1,397,124 | | 203,218 | | 2,879,807 | | 3,042,523 |
| LBSF-JPMM | (1,694,102) | | 2,116,120 | | 10,011,73 | | 10,433,756 | | (17,499,280) |
| LBCS-JPMCB | (66,021,781) | | 65,156,789 | | 0 | | (864,992) | | (10,499,361) |
| LBCS-JPMSL | (21,708,305) | | 18,014,785 | | 0 | | (3,693,520) | | (10,838,137) |
| LBCS-JPMVEC | 43,965,277 | | (45,838,767) | | 164,759 | | (1,708,731) | | (7,808,956) |
| LBCC-JPMCB | (95,425,122) | | 41,909,442 | | 820,603 | | (52,695,077) | | (173,730,717) |
| LBCC-BSFX | (7,461,560) | | 0 | | 58,279,352 | | 50,817,792 | | 48,943,494 |
| TOTAL | 1,081,215,989 | | (990,105,920) | | (1,318,980) | | 89,791,089 | | (2,235,664,298) |

\* including interest accrued
 on such collateral.

219.    The above chart illustrates the claims that should have resulted from commercially reasonable close-outs of the transactions under the Master Agreements.  For example, Lehman determined that the proper calculation of the Close-out Amount under the LBSF-JPMCB Agreement should have been $129,338,293 in LBSF's favor.  Under that Master Agreement, JPMCB had posted collateral to LBSF in the amount of $247,396,154 including accrued interest.  In addition, $73,015,775 was due to JPMCB, but unpaid, at the time the Master Agreement was terminated.  Netting these three numbers together yields a claim of $191,073,637 in JPMCB's favor.  By comparison, JPMCB submitted a wildly inflated claim of $2,197,547,158 under this Master Agreement.

220.    In total, a commercially reasonable calculation of the Close-out Amounts and Loss amounts due under the Master Agreements, when combined with the posted collateral and Unpaid Amounts under those Agreements, should have resulted in claims by JPMorgan totaling $250,035,957 million under the LBSF-JPMCB, LBCS-JPMCB, LBCS-JPMSL, LBCS-JPMVEC, and LBCC-JPMCB Agreements.  At the same time, JPMorgan owes the Lehman

Subsidiaries $339,827,046 under the LBSF-JPMC & Co., LBSF-JPMBD, LBSF-BSCP, LBSF-JPMM, and LBCC-BSFX Agreements.

221.     Instead, JPMorgan submitted claims for $2,235,664,298.  This egregious inflation of more than $2.325 billion is the product of bad faith, commercially unreasonable claims calculations in which JPMorgan concocted phantom claims in order to profit from the billions of dollars of cash it had extracted from LBHI.  These claims have no basis in reality, and should be reduced.

### FIRST CAUSE OF ACTION
**(Objection to Claim Under LBSF-JPMCB Agreement)**

222.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

223.     The LBSF-JPMCB Claim is not a valid claim against LBSF because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.  As described above, JPMCB wrongly delayed its close-out valuations until after the early termination date, improperly charged add-ons, and did not value the trades under the LBSF-JPMCB Agreement in a commercially reasonable manner.

224.     The LBSF-JPMCB Claim should be reduced to $191,073,637.  Plaintiffs hereby expressly reserve the right to further object to the LBSF-JPMCB Claim, or any other claims filed by JPMCB, on any other basis.

### SECOND CAUSE OF ACTION
**(Breach of LBSF-JPMBD Agreement)**

225.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

226. JPMBD breached the LBSF-JPMBD Agreement by calculating the Close-out Amount under the LBSF-JPMBD Agreement in bad faith and in a manner that was both commercially unreasonable and wholly unrelated to its actual economic damages.

227. Under the LBSF-JPMBD Agreement, JPMBD was required to pay LBSF for any gains it enjoyed as a result of termination. A commercially reasonable calculation of the Close-out Amount under the LBSF-JPMBD Agreement would have resulted in a net payment to LBSF in the amount of $180,134,747. Instead, JPMBD calculated a Close-out Amount under the LBSF-JPMBD Agreement resulting in a net payment to LBSF in the amount of $34,642,742.

228. As a direct and proximate result of JPMBD's breach of the LBSF-JPMBD Agreement, LBSF has been deprived of $145,492,005.

### THIRD CAUSE OF ACTION
**(Objection to Claim Under LBSF-JPMM Agreement)**

229. Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

230. The LBSF-JPMM Claim is not a valid claim against LBSF because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions. On information and belief, JPMM engaged in improper conduct similar to that described above, by wrongly delaying its close-out valuations until after the early termination date, improperly charging add-ons, and/or failing to value the trades under the LBSF-JPMM Agreement in a commercially reasonable manner.

231. The LBSF-JPMM Claim should be disallowed and expunged. Plaintiffs hereby expressly reserve the right to further object to the LBSF-JPMM Claim, or any other claims filed by JPMM, on any other basis.

## FOURTH CAUSE OF ACTION
### (Breach of LBSF-JPMM Agreement)

232. Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

233. JPMM breached the LBSF-JPMM Agreement by calculating the Close-out Amount under the LBSF-JPMM Agreement in bad faith and in a manner that was both commercially unreasonable and wholly unrelated to its actual economic damages.

234. Under the LBSF-JPMM Agreement, JPMM was required to pay LBSF for any gains it enjoyed as a result of termination. A commercially reasonable calculation of the Loss amount under the LBSF-JPMM Agreement would have resulted in a net payment to LBSF in the amount of $10,433,756. Instead, JPMM calculated a Loss amount under the LBSF-JPMM Agreement resulting in a net payment to JPMM in the amount of $17,499,280.

235. As a direct and proximate result of JPMM's breach of the LBSF-JPMM Agreement, LBSF has been deprived of $27,933,036.

## FIFTH CAUSE OF ACTION
### (Objection to Claim Under LBCS-JPMCB Agreement)

236. Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

237. The LBCS-JPMCB Claim is not a valid claim against LBCS because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions. On information and belief, JPMCB engaged in improper conduct similar to that described above, by wrongly delaying its close-out valuations until after the early termination date, improperly charging add-ons, and/or failing to value the trades under the LBCS-JPMCB Agreement in a commercially reasonable manner.

238.    The LBCS-JPMCB Claim should be reduced to $864,992.  Plaintiffs hereby expressly reserve the right to further object to the LBCS-JPMCB Claim, or any other claims filed by JPMCB, on any other basis.

**SIXTH CAUSE OF ACTION**
**(Objection to Claim Under LBCS-JPMSL Agreement)**

239.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

240.    The LBCS-JPMSL Claim is not a valid claim against LBCS because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.  On information and belief, JPMSL engaged in improper conduct similar to that described above, by wrongly delaying its close-out valuations until after the early termination date, improperly charging add-ons, and/or failing to value the trades under the LBCS-JPMSL Agreement in a commercially reasonable manner.

241.    The LBCS-JPMSL Claim should be reduced to $3,693,520.  Plaintiffs hereby expressly reserve the right to further object to the LBCS-JPMSL Claim, or any other claims filed by JPMSL, on any other basis.

**SEVENTH CAUSE OF ACTION**
**(Objection to Claim Under LBCS-JPMVEC Agreement)**

242.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

243.    The LBCS-JPMVEC Claim is not a valid claim against LBCS because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the

economic equivalent of the terminated transactions. On information and belief, JPMVEC engaged in improper conduct similar to that described above, by wrongly delaying its close-out valuations until after the early termination date, improperly charging add-ons, and/or failing to value the trades under the LBCS-JPMVEC Agreement in a commercially reasonable manner.

244.    The LBCS-JPMVEC Claim should be reduced to $1,708,731. Plaintiffs hereby expressly reserve the right to further object to the LBCS-JPMVEC Claim, or any other claims filed by JPMVEC, on any other basis.

## EIGHTH CAUSE OF ACTION
### (Objection to Claim Under LBCC-JPMCB Agreement)

245.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

246.    The LBCC-JPMCB Claim is not a valid claim against LBCC because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions. As described above, JPMCB wrongly delayed its close-out valuations until after the early termination date, improperly charged add-ons, and did not value the trades under the LBCC-JPMCB Agreement in a commercially reasonable manner.

247.    The LBCC-JPMCB Claim should be reduced to $52,695,077. Plaintiffs hereby expressly reserve the right to further object to the LBCC-JPMCB Claim, or any other claims filed by JPMCB, on any other basis.

## NINTH CAUSE OF ACTION
### (Breach of LBCC-BSFX Agreement)

248.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

249.     BSFX breached the LBCC-BSFX Agreement by calculating its gain or loss under the LBCC-BSFX Agreement in bad faith and in a manner that was both commercially unreasonable and wholly unrelated to its actual economic damages.

250.     Under the LBCC-BSFX Agreement, BSFX was required to pay LBCC for any gains it enjoyed as a result of termination.  A commercially reasonable calculation of BSFX's gain or loss under the LBCC-BSFX Agreement would have resulted in a net payment to LBCC in the amount of $50,817,792.  Instead, BSFX's calculation of its gain or loss under the LBCC-BSFX Agreement resulted in a net payment to LBCC in the amount of $48,943,494.

251.     As a direct and proximate result of BSFX's breach of the LBCC-BSFX Agreement, LBCC has been deprived of $1,874,298.

### TENTH CAUSE OF ACTION
**(Declaratory Judgment that the BSCP Setoff is Not Permitted Under Section 553 of the Bankruptcy Code)**

252.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

253.     Under section 553 of the Bankruptcy Code, a creditor is able to "offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case."  11 U.S.C. § 553(a).

254.     By effectuating the BSCP Setoff, JPMCB paid itself on account of its alleged claim against LBSF by netting such claim against a payable owed by BSCP to LBSF. Thus, the BSCP Setoff lacked mutuality.

255.     The parties to this action are the parties who have, or who may claim to have, an interest that may be affected by the declaration requested.

256. This action is within the jurisdiction of this Court and Plaintiffs are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

257. An actual controversy exists between Plaintiffs and BSCP which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

258. Plaintiffs therefore request a judgment (a) declaring the BSCP Setoff is not permitted under the Bankruptcy Code and (b) requiring JPMCB and/or BSCP to turn over to LBSF the amount of the BSCP Setoff.

### ELEVENTH CAUSE OF ACTION
**(Declaratory Judgment that the JPMBD Setoff is Not Permitted Under Section 553 of the Bankruptcy Code)**

259. Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

260. Under section 553 of the Bankruptcy Code, a creditor is able to "offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a).

261. By effectuating the JPMBD Setoff, JPMCB paid itself on account of its alleged claim against LBSF by netting such claim against a payable owed by JPMBD to LBSF. Thus, the JPMBD Setoff lacked mutuality.

262. The parties to this action are the parties who have, or who may claim to have, an interest that may be affected by the declaration requested.

263. This action is within the jurisdiction of this Court and Plaintiffs are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

264. An actual controversy exists between Plaintiffs and JPMBD which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

265.     Plaintiffs therefore request a judgment (a) declaring the JPMBD Setoff is not permitted under the Bankruptcy Code and (b) requiring JPMCB and/or JPMBD to turn over to LBSF the amount of the JPMBD Setoff.

## TWELFTH CAUSE OF ACTION
### (Declaratory Judgment that the BSFX Setoff is Not Permitted Under Section 553 of the Bankruptcy Code)

266.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

267.     Under section 553 of the Bankruptcy Code, a creditor is able to "offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a).

268.     By effectuating the BSFX Setoff, JPMCB paid itself on account of its alleged claim against LBCC by netting such claim against a payable owed by BSFX to LBCC. Thus, the BSFX Setoff lacked mutuality.

269.     The parties to this action are the parties who have, or who may claim to have, an interest that may be affected by the declaration requested.

270.     This action is within the jurisdiction of this Court and Plaintiffs are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

271.     An actual controversy exists between Plaintiffs and BSFX which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

272.     Plaintiffs therefore request a judgment (a) declaring the BSFX Setoff is not permitted under the Bankruptcy Code and (b) requiring JPMCB and/or BSFX to turn over to LBCC the amount of the BSFX Setoff.

## THIRTEENTH CAUSE OF ACTION
**(Declaratory Judgment that the LBCS-JPMCB Setoff is Not Permitted Under Section 553 of the Bankruptcy Code)**

273.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

274.     Under section 553 of the Bankruptcy Code, a creditor is able to "offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a).

275.     By effectuating the LBCS-JPMCB Setoff, JPMCB paid itself on account of its alleged claim against LBSF by netting such claim against collateral posted by LBCS. Thus, the LBCS-JPMCB Setoff lacked mutuality.

276.     The parties to this action are the parties who have, or who may claim to have, an interest that may be affected by the declaration requested.

277.     This action is within the jurisdiction of this Court and Plaintiffs are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

278.     An actual controversy exists between Plaintiffs and JPMCB which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

279.     Plaintiffs therefore request a judgment (a) declaring the LBCS-JPMCB Setoff is unlawful and not permitted under the Bankruptcy Code and (b) requiring JPMCB to turn over to LBCS the amount of the LBCS-JPMCB Setoff.

## FOURTEENTH CAUSE OF ACTION
**(Declaratory Judgment that the JPMVEC Setoff is Not Permitted Under Section 553 of the Bankruptcy Code)**

280.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

281. Under section 553 of the Bankruptcy Code, a creditor is able to "offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a).

282. By effectuating the JPMVEC Setoff, JPMVEC paid itself on account of its alleged claim against LBCS by netting such claim against collateral posted by LBCS under the LBCS-JPMCB Master Agreement. Thus, the JPMVEC Setoff lacked mutuality.

283. The parties to this action are the parties who have, or who may claim to have, an interest that may be affected by the declaration requested.

284. This action is within the jurisdiction of this Court and Plaintiffs are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

285. An actual controversy exists between Plaintiffs and JPMVEC which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

286. Plaintiffs therefore request a judgment (a) declaring the JPMVEC Setoff is not permitted under the Bankruptcy Code and (b) requiring JPMCB and/or JPMVEC to turn over to LBCS the amount of the JPMVEC Setoff.

### FIFTEENTH CAUSE OF ACTION
**(Declaratory Judgment that the JPMC & Co. Setoff is Not Permitted Under Section 553 of the Bankruptcy Code)**

287. Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

288. Under section 553 of the Bankruptcy Code, a creditor is able to "offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a).

289. By effectuating the JPMC & Co. Setoff, JPMCB paid itself on account of its alleged claim against LBSF by netting such claim against a payable owed by JPMC & Co. to LBSF. Thus, the JPMC & Co. Setoff lacked mutuality.

290. The parties to this action are the parties who have, or who may claim to have, an interest that may be affected by the declaration requested.

291. This action is within the jurisdiction of this Court and Plaintiffs are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

292. An actual controversy exists between Plaintiffs and JPMC & Co. which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

293. Plaintiffs therefore request a judgment (a) declaring the JPMC & Co. Setoff is unlawful and not permitted under the Bankruptcy Code and (b) requiring JPMCB and/or JPMC & Co. to turn over to LBSF the amount of the JPMC & Co. Setoff.

## SIXTEENTH CAUSE OF ACTION
### (Declaratory Judgment that the JPMCB Setoff is Not Permitted Under Section 553 of the Bankruptcy Code)

294. Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

295. Under section 553 of the Bankruptcy Code, a creditor is able to "offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a).

296. By effectuating the JPMCB Setoff, JPMSL paid itself on account of its alleged claim against LBCS by netting such claim against a payable owed by JPMCB. to LBCS. Thus, the JPMCB Setoff lacked mutuality.

297.     The parties to this action are the parties who have, or who may claim to have, an interest that may be affected by the declaration requested.

298.     This action is within the jurisdiction of this Court and Plaintiffs are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

299.     An actual controversy exists between Plaintiffs and JPMCB and/or JPMSL which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

300.     Plaintiffs therefore request a judgment (a) declaring the JPMCB Setoff is unlawful and not permitted under the Bankruptcy Code and (b) requiring JPMCB and/or JPMSL to turn over to LBSF the amount of the JPMCB Setoff.

**SEVENTEENTH CAUSE OF ACTION**
**(Objection to Claims Filed by JPMorgan)**

301.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

302.     Plaintiffs hereby object to the following claims:

LBSF-JPMCB Claim;

LBSF-JPMM Claim;

LBCS-JPMCB Claim;

LBCS-JPMSL Claim;

LBCS-JPMVEC Claim; and

LBCC-JPMCB Claim (collectively, the "Swap Claims").

303.     Pursuant to the terms of the Stipulation, the Swap Claims shall be disallowed in their entirety based upon the failure of JPMorgan to provide documentation to the Lehman Subsidiaries in support of such claims, and the Plaintiffs hereby expressly reserve the

right to further object to the Swap Claims, or any other claims filed by JPMorgan, on any other basis.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment against JPMorgan as follows:

A.     Sustaining the Plaintiffs' objections to the Swap Claims reducing such claims to the amounts set forth herein;

B.     Determining that JPMorgan has breached the LBSF-JPMBD Agreement, the LBSF-JPMM Agreement, and LBCC-BSFX Agreement and owes the Lehman Subsidiaries damages in the amounts set forth herein;

C.     Awarding declaratory judgments in favor of the Lehman Subsidiaries as set forth herein, including declaration of the parties' rights and obligations under the Master Agreements;

D.     Sustaining the Plaintiffs' objection to the  Swap Claims and disallowing and expunging such claims in their entirety pursuant to the terms of the Stipulation;

E.     Awarding statutory interest, as well as costs and disbursements of this action and attorneys' fees; and

F.     Awarding such other relief as this Court deems just and proper.

*[Remainder of Page Intentionally Left Blank.]*

Dated: November 16, 2012
New York, New York

Respectfully submitted,

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**
By: */s/ Joseph D. Pizzurro* _____
Joseph D. Pizzurro
L.P. Harrison 3rd
Michael J. Moscato
Andrew H. Seiden
Nancy E. Delaney
Peter J. Behmke
Cindi Eilbott Giglio
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000

*Counsel for the Debtors and Debtors in
Possession*

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
By: */s/ James Tecce* _____
Daniel Cunningham
Andrew Rossman
James Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000

Benjamin Odell
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

*Special Counsel for the Official Committee
of Unsecured Creditors of Lehman Brothers
Holdings Inc.*